1  MICHAEL J. ROBINSON-DORN, WSBA #29856
2  University of Washington School of Law
   Kathy and Steve Berman Environmental Law Clinic
3  William H. Gates Hall
   P.O. Box 85110
4  Seattle, WA  98145
5  (206) 616-7729

6  Attorney for the Plaintiff

7

8  ### THE UNITED STATES DISTRICT COURT
   ### FOR THE EASTERN DISTRICT OF WASHINGTON

9

10

11  WASHINGTON TROUT, a non-profit                No.
12  organization,

13              Plaintiff,                        WASHINGTON TROUT'S
                                                  COMPLAINT FOR DECLARATORY
14        v.                                      AND INJUNCTIVE RELIEF

15
    GALE NORTON, in her official capacity
16  as Secretary of the Interior; U.S. FISH &
17  WILDLIFE SERVICE; MATTHEW J.
    HOGAN, in his official capacity as the
18  Acting Director of the U.S. FISH &
19  WILDLIFE SERVICE;  JULIE
    COLLINS, in her official capacity as
20  manager of the Leavenworth National
21  Fish Hatchery Complex,

22              Defendants.

23

24

25

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF

# INTRODUCTION

1.      Washington Trout brings this action for declaratory and injunctive relief to require the United States Fish and Wildlife Service ("USFWS") to comply with the Endangered Species Act ("ESA"), and to enjoin the Leavenworth National Fish Hatchery ("Leavenworth NFH" or "Hatchery")—a USFWS facility—from continuing to take native stocks of endangered steelhead trout, endangered spring Chinook salmon, and threatened bull trout in violation of the ESA.  16 U.S.C. § 1538(a)(1).

2.      Washington Trout also brings this action to require the USFWS to comply with the National Environmental Policy Act ("NEPA") before undertaking major federal actions at the Leavenworth NFH, including the modification of structures blocking fish passage and the construction of a major water intake and waste-water pump-back project, without an analysis of the direct, indirect, and cumulative impacts of those actions on the environment.

3.      For several years, concerned local citizens, including members of Washington Trout, have attempted to work cooperatively with the USFWS in a public-private partnership to restore natural fish passage on Icicle Creek and to ensure that the Leavenworth NFH complies with federal and state laws.  That partnership effort led to the preparation of a Final Environmental Impact Statement

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 2-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

and Record of Decision for the Icicle Creek Restoration Project in 2002.  At that time, the USFWS selected as its preferred alternative the removal of several abandoned Hatchery structures in the natural channel of Icicle Creek, and the modification of two others to allow for fish passage.  The USFWS stated that the purpose and need for the Icicle Creek Restoration Project was to provide long-term, sustainable, year-round passage, and to provide habitat for threatened and endangered species.

4.      The Record of Decision for the Icicle Creek Restoration Project indicated that the removal and modifications to the remaining structures to allow for fish passage would be accomplished "within one year."

5.      Unfortunately, the private-public partnership has faltered.  The USFWS soon backed away from its plan, failing to remove abandoned dams, weirs, and rack structures littering the natural channel and blocking fish passage.

6.      Facing agency inaction and increased hostility, the members of the Icicle Creek Watershed Council ("ICWC") (a watershed council made up of private parties and local land owners) took it upon themselves to pay for the removal of several of these structures, at a cost of more than $200,000.   Since that time, the USFWS has failed to modify the existing structures, and has instead operated them in ways that block fish passage for threatened and endangered species, and in ways

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 3-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

that degrade habitat.   As such, the USFWS is failing to comply with the ESA, one
of the laws that the USFWS is charged with enforcing.

7.      Further, USFWS is now proceeding with plans to complete a so-called Phase
II of the Icicle Creek Restoration Project, and planning to rehabilitate its water
supply system and add a waste-water pump-back project to assist fish passage.  In
each case, USFWS is proceeding without adequate and necessary consultations
under the ESA, and without adequate and necessary analysis of environmental
impacts under NEPA.

8.      Accordingly, Washington Trout seeks, among other remedies, an order
enjoining the Leavenworth NFH from continuing to take threatened and
endangered fish species in violation of the ESA.   Washington Trout further seeks
an order compelling USFWS to reinitiate and complete consultation regarding the
effects of Hatchery operations on all federally listed threatened and endangered
species, and to undertake necessary analysis of the proposed projects and its
operations under NEPA.  The requested relief is necessary to prevent continued
illegal agency action and forestall irreparable injury to protected species and
Plaintiff's interests.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 4-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

**JURISDICTION AND VENUE**

9.      This Court has jurisdiction over Washington Trout's ESA and NEPA claims

pursuant to 28 U.S.C. § 1331 (federal question), 16 U.S.C. § 1540(g) (ESA citizen

suit provision), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  The

requested relief is also proper under 28 U.S.C. § 2201 (declaratory relief) and 28

U.S.C. § 2202 (injunctive relief).

10.      As required by the ESA, 16 U.S.C § 1540(g), Plaintiff furnished the

USFWS, the Secretary of Interior, and the Secretary of Commerce with written

notice of intent to sue more than 60 days ago in a letter postmarked March 17,

2005.  Washington Trout's notice of intent to sue was received by the Hatchery on

March 21, 2005, by the Department of Commerce on March 23, 2005, and by the

Department of Interior on March 25, 2005.  USFWS has not remedied the alleged

violations; they are ongoing and reasonably likely to continue.  Plaintiff's claims

also arise under NEPA.  Accordingly, an actual, justiciable controversy exists

between Washington Trout and the federal Defendants.

11.      Venue is properly vested in this Court pursuant to 16 U.S.C. 1540(g)(3)(A)

and 28 U.S.C. § 1391(e) because Defendant Leavenworth NFH is located in this

judicial district, a substantial part of the events or omissions giving rise to the

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 5-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

1   claims occurred in this district, and to the extent that real property is involved in

2   this action, such property is located in this judicial district.

3                                      **PARTIES**

4

5   12.    Plaintiff Washington Trout is a non-profit, 501(c)(3) organization with its

6   principal place of business in Duvall, Washington.  Washington Trout is dedicated

7   to the preservation and recovery of Washington's native fish species and the

8   ecosystems upon which those species depend.

9

10  13.    Washington Trout brings this action on behalf of itself and its approximately

11  2,400 members.

12  14.    As an environmental watchdog, Washington Trout actively informs the

13  public on matters affecting water quality, fish, and fish habitat in the State of

14  Washington through publications, commentary to the press, and sponsorship of

15  educational programs.  Washington Trout also conducts field research on wild-fish

16  populations and has designed and implemented habitat restoration projects.

17  Washington Trout has lobbied, litigated, and publicly commented on federal and

18

19  state actions that affect state waters.  For example, Washington Trout corrected the

20  misidentification of over 4,500 fish-bearing streams throughout the state, thereby

21  qualifying those waters for additional legal protection.  Washington Trout routinely

22

23  seeks to compel the USFWS, an agency charged with protecting biologically

24

25

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 6-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

imperiled species such as bull trout, to follow the laws designed to protect and

recover those species.

15.     Washington Trout's staff and members derive scientific, recreational, health,

conservation, spiritual, and aesthetic benefits from the preservation and protection

of threatened and endangered species under the ESA.  More specifically,

Washington Trout's staff and members spend time in areas, including Icicle Creek,

that are adversely affected by USFWS' lack of compliance with the ESA, and

member(s) of Washington Trout reside near and regularly visit these areas of Icicle

Creek.

16.     Washington Trout's staff and members use Icicle Creek for recreation and

spiritual renewal.  Its staff and members derive recreational, scientific and aesthetic

benefits from the existence of a healthy ecosystem and from wild salmon and trout

in Icicle Creek.  Washington Trout's staff and members observe, study,

photograph, and appreciate Icicle Creek's native fish populations.  In addition,

staff and members of Washington Trout have met with, negotiated with, and

worked closely with, USFWS personnel concerning native fish passage issues and

Hatchery operations.

17.     Washington Trout staff and members have also suffered procedural and

informational harms connected to their substantive, conservation, recreation, and

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 7-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX  85110
SEATTLE, WA  98145
(206) 543-3434

scientific activities resulting from USFWS' failure to complete and undertake

consultations mandated by Section 7 of the ESA.  Washington Trout's staff and

members rely in part on the Section 7 consultation process to protect threatened

and endangered species from injuries inflicted by Defendants' Hatchery activities.

18.    The past, present, and future enjoyment of these benefits, including the

recreational, aesthetic, and scientific interests of Washington Trout staff and

members, has been, is being, and will continue to be harmed by Defendants'

failure to comply with the ESA and NEPA.   The consultation process provides

agency decision makers, Washington Trout, and the public with essential

information regarding the effects of USFWS-approved and NOAA-approved

actions with effects on threatened and endangered species.

19.    The injuries described above are actual, concrete injuries that the Court may

remedy by declaring that Defendants' activities are illegal and enjoining

Defendants from taking further illegal actions.

20.    Defendant Gale Norton is the Secretary of the Interior and, as such, is the

federal official ultimately responsible for ensuring that the USFWS complies with

the ESA and NEPA.

21.    Defendant USFWS is an executive branch department within the

Department of the Interior.   USFWS is responsible for administering the

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 8-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

provisions of the Endangered Species Act with regard to threatened and

endangered species, including the threatened bull trout that inhabit Icicle Creek.

22.     Defendant Matthew J. Hogan is the Acting Secretary of the USFWS.

23.     Defendant Julie Collins is the Complex Manager of the Leavenworth NFH

Complex and, as such, is responsible for the Hatchery's compliance with the ESA

and NEPA.

## STATUTORY BACKGROUND

**A.      The Governing Law**

### The Endangered Species Act

24.     The ESA is a federal statute whose purpose is to provide a program to

conserve threatened and endangered species and a means to protect the ecosystems

upon which those species depend.  16 U.S.C. § 1531(b).

25.     To this end, the ESA requires the Secretary of the Interior or the Secretary

of Commerce to protect such species by listing them as either threatened or

endangered. 16 U.S.C. § 1533.

26.     Section 9 of the ESA and its implementing regulations prohibit any person,

including federal agencies, from "taking" a threatened or endangered species.  16

U.S.C. § 1538(a)(1); 50 C.F.R. § 227.21.  "Taking" is defined broadly under the

ESA to include harassing, harming, pursuing, hunting, shooting, wounding, killing,

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 9-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

trapping, capturing, or collecting, or to attempting to engage in any such conduct regarding a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns.  16 U.S.C. § 1532(19); 50 C.F.R. § 222.102.

27.     "Take" by federal agencies is permitted if, upon the completion of formal consultation, the agency receives an incidental take statement pursuant to Section 7(b)(4).  An incidental take statement specifies the impact of any incidental take, provides for reasonable and prudent measures necessary to minimize impacts, and sets forth terms and conditions that must be followed.  16 U.S.C. § 1536(b)(4). "Take" by federal agencies of a threatened species may also be permitted if the activity is exempted from the prohibition on "take" through conservation regulations issued pursuant to Section 4(d).  16 U.S.C. § 1533(d)

28.     Section 7(a)(2) of the ESA requires all federal agencies, including USFWS, to "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered or threatened species."  16 U.S.C. § 1536(a)(2).  To carry out this mandate, the acting agency must consult with NOAA Fisheries, the delegated agency of the Secretary of Commerce, whenever the action agency's actions "may affect" a listed species under NOAA Fisheries' jurisdiction.  The acting agency must consult with USFWS, as the delegated agency from the Secretary of the Interior, whenever the

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 10-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

action agency's actions "may affect" a listed species under USFWS' jurisdiction.

Id.

29.      When an agency's actions "may affect" a listed species, consultation under Section 7(a)(2) results in the preparation of a biological opinion ("BiOp") by either NOAA Fisheries or USFWS that determines whether or not the action is likely to jeopardize a listed species.  16 U.S.C. § 1536(a)(2).

30.      Any taking of threatened or endangered species that is in compliance with the terms and conditions specified in a biological opinion shall not be considered to be a prohibited taking of the species concerned.  16 U.S.C. § 1536(o)(2).  Any taking occurring in violation of the terms and conditions of an incidental take statement, or in excess of that permitted under the incidental take statement, is a violation of Section 9 of the ESA.  16 U.S.C. § 1538.

31.      The acting agency's duties under the ESA do not end with the issuance of a biological opinion and incidental take statement.  The action agency must reinitiate formal consultation where discretionary Federal involvement or control over the action has been retained or is authorized by law and "the amount or extent of taking specified in the incidental take statement is exceeded" or "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered."  50 C.F.R. § 402.16.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 11-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

32.      Section 7(d) of the ESA further provides that once a federal agency initiates consultation on an action under Section 7(a)(2), it "shall not make any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate" Section 7(a)(2).  16 U.S.C. § 1536(d).  The purpose of Section 7(d) is to maintain the environmental status quo pending completion of interagency or internal agency consultation.

## The National Environmental Policy Act

33.      NEPA is our "basic national charter for the protection of the environment." 40 C.F.R. § 1500.1.

34.      The purpose of NEPA, "recognizing the profound impact of man's activity on the interrelations of all components of the human environment, particularly the profound influences of population growth [and] high-density urbanization," is "to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

35.    To this end, NEPA requires federal agencies to prepare detailed statements for all actions which they approve "significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C).  These statements, called environmental impact statements ("EIS"), are detailed reports completed after a thorough analysis and study that report on the environmental effects of the proposed action and describe alternatives to the proposed action.

36.    NEPA and its implementing regulations further require that all related, similar, interconnected, or interdependent actions, including proposed actions that are similar in geographic scope or extent, or will have similar environmental impacts, must be analyzed together in an EIS.  See 40 C.F.R. §§ 1501 et seq.  Such analyses must also include consideration of a reasonable range of alternatives to a proposed action. 42 U.S.C. § 4332(2)(C)(iii); see also 40 C.F.R. § 1502.14.

37.    An agency may not avoid preparation of an EIS by "breaking . . . down [its action] into small component parts." 40 C.F.R. § 1508.27(b)(7).

38.    The Council on Environmental Quality ("CEQ")—an agency within the Executive Office of the President—has promulgated regulations implementing NEPA that are "binding on all federal agencies." 40 C.F.R. § 1500.3.

39.    Even after a NEPA process is completed, where an agency learns of "significant new circumstances" or new "information relevant to environmental

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

concerns and bearing on the proposed action or its impacts," the agency must

undertake further review under NEPA. Id. § 1502.9(c).

## The Administrative Procedure Act

40.     The Administrative Procedure Act ("APA") authorizes courts reviewing

agency action to hold unlawful and set aside final agency action, findings, and

conclusions that are arbitrary and capricious, an abuse of discretion, or otherwise

not in accordance with law. 5 U.S.C. § 706(2)(A). EISs and environmental

assessments ("EAs") issued pursuant to NEPA are reviewed under this provision of

the APA.

## FACTUAL BACKGROUND

### Icicle Creek

41.     Icicle Creek originates in the Cascade Mountains of Washington State and

is a fourth-order tributary to the Wenatchee River, which is a tributary to the

Columbia River.

42.     Icicle Creek contains natural populations of: steelhead trout

(*Oncorhynchus mykiss*), spring Chinook salmon (*Oncorhynchus tschawytscha*),

and bull trout (*Salvelinus confluentus*). Spring Chinook salmon produced by the

Hatchery are not listed under the ESA.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 14-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

43.     In the upper Columbia River, an area that includes Icicle Creek, steelhead trout and spring Chinook salmon are listed as endangered species under the ESA. Both of these species are managed by NOAA Fisheries.

44.     In the upper Columbia River, bull trout are listed as threatened species under the ESA and are managed by the USFWS.

45.     Icicle Creek is listed on the State of Washington's Clean Water Act 303(d) list for 1998, as violating State water quality standards for temperature, dissolved oxygen and instream flow.  The Hatchery is among the entities listed as contributing to this degraded condition.

46.     As explained more fully below, Defendants' actions have degraded, and continue to degrade, the ecosystem in Icicle Creek.  Likewise, Defendants' actions block and interfere with fish passage for threatened and endangered species in Icicle Creek.

**The Leavenworth National Fish Hatchery**

47.     Constructed in 1939 and 1940, the Leavenworth NFH is located approximately three miles south of the city of Leavenworth, Washington, on the banks of Icicle Creek.

48.     Originally designed to maintain salmon stocks blocked by construction of the Grand Coulee Dam on the Columbia River, the Leavenworth NFH initially

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 15-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

reared fish in holding ponds constructed in a one mile stretch of natural channel of Icicle Creek.  Hatchery operations at that time were conducted principally within this stretch of Icicle Creek.

49.     The most upstream of the holding pond structures, the Headgate Dam, was used to control water flow over the fish holding ponds and divert excess water into a 4,000 foot-long manmade canal sending water over a spillway dam where it is returned to Icicle Creek.

50.     Fish migrations to areas above the Hatchery were blocked by the spillway at the base of the canal and by a series of dams and weirs in the natural channel of Icicle Creek.  Included among these blocking structures in the natural channel was Dam 5, located just upstream of the confluence of the natural channel and the spillway dam.

51.     Over time, the intermediate structures between the Headgate Dam and Dam 5 were abandoned, and the USFWS no longer used the natural channel of Icicle Creek for Hatchery fish propagation.  Unfortunately, these abandoned structures were left in place for decades, where they continued to block native fish passage.

52.     Although the Hatchery no longer uses the natural channel of Icicle Creek to raise fish, the Hatchery continues to use the Headgate Dam to divert water from

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 16-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

Icicle Creek's natural channel into the Hatchery's manmade canal.  At most times of the year the Hatchery's diversion of water into its manmade canal significantly dewaters the natural channel of Icicle Creek between the Headgate Dam and Dam 5.

53.      When its gates are closed, the Headgate Dam also acts as a barrier to upstream and downstream fish passage, including passage for endangered steelhead, endangered spring Chinook salmon, and threatened bull trout.  When the gates are open, the Headgate Dam can still act as a partial barrier to migration depending on water volume through the Dam and the configuration of the gates.

54.      According to USFWS, more than 20 miles of Icicle Creek habitat is located above the Headgate Dam.

55.      Dam 5 also blocks upstream and downstream fish passage, including passage for endangered steelhead trout, endangered spring Chinook salmon, and threatened bull trout.   The Hatchery's placement of stop logs in Dam 5 when conducting broodstock trapping activities and at other times of the year blocks fish passage.

56.      The Hatchery's water intake is located approximately 1.5 miles upstream of the Hatchery.  The water intake structure consists of a diversion dam, fish ladder, wide bar trash rack, and another narrower trash rack (1 ½ inch spacing)

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

located in a building.  Water is conveyed from this intake to the Hatchery, using gravity, through a buried 31-inch pipe system.

57.     This water enters a sand-settling basin and goes through two screening chambers before use at the Hatchery.

58.     On March 31, 1999, the USFWS Moses Lake Field Office issued a memorandum ("1999 USFWS Memo") concluding informal consultation under the ESA for fish propagation operations, including Hatchery operations at the Leavenworth NFH.

59.     The 1999 USFWS Memo identified the potential for migratory bull trout to enter the unscreened Hatchery water intake pipe and stated that "screening of the intake pipe and other protective measures to avoid the take of listed species should be a priority."

60.      To date, the USFWS has failed to install appropriate screens on its water intake.  The existing fish screening devices on the Hatchery's water intake system are outdated, inefficient, and do not comply with current federal and state regulatory requirements.

**Initial Efforts to Restore Fish Passage and the Ecosystem in Icicle Creek**

61.     Beginning in 1998, Washington Trout has worked together with the ICWC and individuals in the Leavenworth area to restore upstream and downstream

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 18-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

passage for fish in Icicle Creek, including passage for threatened and endangered

species.

62.     After negotiating with members of the ICWC and others, the Hatchery

agreed to implement a plan to restore Icicle Creek's natural channel and provide

for fish passage into the upper reaches of Icicle Creek.

63.     In January 2002, USFWS published a Final Environmental Impact

Statement ("FEIS") for the Icicle Creek Restoration Project.  In the FEIS, USFWS

stated that its preferred alternative included removal of all structures in the natural

channel, with the exception of the Headgate Dam and Dam 5—both of which were

to be modified to allow for fish passage.

64.     The FEIS expressly avoids a detailed analysis of the Hatchery's water

intake structure, effects of water withdrawals from that structure, or general

hatchery operations.    Instead, the FEIS focuses on the effects related to the

construction and mitigation activities related to the restoration of fish passage in

the natural channel of Icicle Creek.

65.     On March 12, 2002, USFWS issued a Biological Opinion addressing the

Icicle Creek Restoration Project ("2002 USFWS Restoration BiOp") and

concluded that the Restoration Project was not likely to jeopardize the continued

existence of bull trout in the impacted segment of Icicle Creek.  The Terms and

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 19-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX  85110
SEATTLE, WA  98145
(206) 543-3434

Conditions of the accompanying Incidental Take Statement addressed demolition and construction activities in the Icicle Creek channel and not ongoing Hatchery operations.

66.     On April 3, 2002, NOAA Fisheries approved a Biological Opinion addressing the Icicle Creek Restoration Project ("2002 NOAA Restoration BiOp"), and concluded the Restoration Project was not likely to jeopardize the continued existence of steelhead trout and spring Chinook salmon in the impacted portion of Icicle Creek.  The 2002 NOAA Restoration BiOp, and the Terms and Conditions for the accompanying Incidental Take Statement for the Restoration Project addressed demolition and construction activities in the Icicle Creek channel and not ongoing Hatchery operations.

## Additional Fragmentation of the Restoration Project

67.     After issuance of the FEIS and Record of Decision for the Icicle Creek Restoration Project, the Hatchery announced that it did not have adequate funding to implement the Icicle Creek Restoration Project as proposed, planned, and analyzed.

68.     Frustrated by this turn of events, members of the ICWC used over $200,000 of their own funds to remove several of the long-abandoned and broken weirs, dams, and other structures littering the natural channel of Icicle Creek,

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

leaving only the Headgate Dam and Dam 5.  Washington Trout provided technical assistance to the ICWC to help it determine the impacts and effects of implementing the Restoration Project.

69.     Since that time, the Hatchery has failed to remove, modify, or operate the two remaining barriers to fish passage in the natural channel of Icicle Creek adjacent to the Hatchery (the Headgate Dam and Dam 5) to allow for fish passage. The Hatchery has also failed to provide sufficient flows to remove accumulated sediments and restore habitat in the natural channel.

70.     Upon information and belief, the Hatchery now plans to move forward with plans for what it calls "Phase II" of the Icicle Creek Restoration Project.

71.     In this so-called Phase II, the Hatchery proposes to, among other things: (1) construct a fish sorter, using Dam 5 as part of the structure; (2) build a vertical slot fish way (fish ladder) at the Headgate Dam; and (3) rehabilitate and modify the Headgate Dam.

72.     On or about July 26, 2003, the U.S. Bureau of Reclamation met with representatives of the U.S. Army Corps of Engineers, Washington Department of Ecology, Washington Department of Fish and Wildlife, Chelan County, USFWS, NOAA Fisheries, and the ICWC concerning Phase II preliminary designs.

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

73.     At that June 2003 meeting, a representative from USFWS reported that new data collected from radio-tagged bull trout demonstrated that bull trout were moving back and forth between the lower Wenatchee River and the main spillway at the Leavenworth NFH all year.  USFWS further reported, based on this newly collected data, that it appeared that in addition to upstream spawners and downstream juveniles, resident fish in the Wenatchee and Icicle systems need to be able to pass above the Hatchery facilities at all times of the year.  This radio telemetry data was neither known nor taken into account in the FEIS for the Restoration Project or the USFWS Restoration BiOp.

74.     In addition to the bull trout radio telemetry data, the following and significant information concerning the Restoration Project is now available: (1) during the USFWS' proposed fish sorter operations (May through December) flows in the historical channel will be limited to no more than 400 cfs, thereby limiting restoration of Icicle Creek's historic channel and potentially leading to further degradation of important habitat;  (2) the fish ladder location will be located in the north bay of the Headgate Dam, resulting in lower flows past the Headgate Dam and into the natural Channel of Icicle Creek; (3) because Icicle Creek water is over-appropriated, the Hatchery needed to find a water source other than Icicle Creek itself, to provide water for the fish sorter and for a pipe to return fish to the

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

pool below the spillway dam; and (4) during value engineering exercises for Phase II, the Hatchery decided that pumped-back Hatchery wastewater from the Water Supply Rehabilitation Project (described more fully in paragraphs 79-90 below) could be used for the proposed fish sorter at Dam 5.

75.    The Hatchery has not supplemented its FEIS for the Icicle Creek Restoration Project in light of these changes, delays, and new information.

76.    The Hatchery has not reinitiated consultation with NOAA Fisheries concerning Phase II of the Restoration Project in light of these changes, delays, and new information.

77.    The Hatchery has not reinitiated consultation with USFWS concerning Phase II of the Restoration Project in light of these changes, delays and new information.

78.    USFWS had previously indicated that it would begin implementation of Phase II on August 1, 2005.

79.    On June 10, 2005, the U.S. Army Corps of Engineers issued a notice of an application from the Hatchery for a permit under Section 404 of the Clean Water Act to proceed with Phase II.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 23-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

**The Hatchery Adds a Water Supply and Pump-Back Project**

80.    Following the issuance of the FEIS for the Icicle Creek Restoration Project, the Hatchery announced that it plans to move forward with a Water Supply Rehabilitation Project.

81.    As part of the Water Supply Rehabilitation Project, the USFWS proposes to replace and upgrade the Hatchery's gravity intake on Icicle Creek, and replace approximately 1.5 miles of water supply pipeline from the intake to the Hatchery.

82.    In addition, as part of this project, the USFWS proposes to construct a new wastewater pump-back system that would transport up to 42 cfs of Hatchery wastewater back upstream via a buried 7,500 foot, 36 inch diameter pipeline to a discharge point just below the intake structure.

83.    Additionally, the USFWS proposes to connect the pumped-back untreated Hatchery wastewater (9–11) cfs to the proposed fish sorter at Dam 5, proposed to be built as part of "Phase II" of the Icicle Creek Restoration Project.  This proposal, or alternative, was not analyzed in the EA for the Water Supply System Rehabilitation Project or in the Icicle Creek Restoration Project FEIS.

84.    The USFWS also proposes to connect the pumped-back Hatchery wastewater to the existing Cascade Orchard Irrigation Company pipeline to allow a

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 24-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

portion of the Hatchery's pumped-back wastewater (12 cfs) to be routed directly to the irrigation company in lieu of water from Icicle Creek.

85.    Among the USFWS' stated purposes for the wastewater pump-back project is mitigation for Hatchery water withdrawals and its attendant impacts on water quality and fish passage.

86.    In June 2003, USFWS issued a Biological Assessment ("USFWS Water Supply BA") for the Water Supply System Rehabilitation Project.  In that BA, USFWS found that the Project may affect, but is not likely to adversely affect, UCR steelhead trout, and have no effect on UCR spring Chinook salmon because they are not in the action area.  The USFWS also concluded that the Rehabilitation Project may affect, but was not likely to adversely affect, bull trout.

87.    Upon information and belief, USFWS did not formally consult with NOAA Fisheries concerning the Water Supply System Rehabilitation Project and NOAA Fisheries has not issued a biological opinion addressing the Waster Supply System Rehabilitation Project.

88.    In September 2003, the USFWS issued a Final Environmental Assessment ("FEA") for its proposed Water Supply System Rehabilitation Project.

89.    While the FEA purports to incorporate by reference and build upon the FEIS for the Icicle Creek Restoration Project (FEA at 1-1) the FEA fails to analyze

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 25-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

the cumulative impacts of Phase II of the Restoration Project and fails to

adequately explain the relationship between the two projects, including the

Hatchery's continued use of the Headgate Dam to divert water into its manmade

canal, and the relationship of the pump-back project to the Hatchery's proposed

fish sorter at Dam 5.

90.     In addition, the FEA fails to adequately address the potential effects on the

environment from discharging up to 42 cfs of the Hatchery's waste water into a

segment of Icicle Creek that has not previously been subjected to Hatchery waste

water discharge, particularly in light of the fact that at certain times of the year this

wastewater discharge would constitute a significant portion of Icicle Creek.

91.     The FEA also fails to examine the potential impact to the environment and

economy of using pumped-back waste water on lands currently irrigated by water

drawn directly from Icicle Creek.

92.     The Hatchery has recently announced that it plans to begin construction of

the water supply and pump-back project as early as July 2005.

**NOAA Fisheries Issues a Second BiOp and Incidental Take Statement**

93.     On October 23, 2003, a month after USFWS issued its EA for the Water

Supply Rehabilitation Project, NOAA Fisheries approved a second Biological

Opinion ("2003 BiOp") addressing all federal fish hatchery operations on the upper

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

Columbia River.  In this 2003 BiOp, NOAA Fisheries concluded that fish hatchery operations would not jeopardize the continued existence of steelhead trout and spring Chinook salmon.

94.     The 2003 BiOp states that "adverse impacts on listed fish due to the operation of hatchery facilities for the propagation of unlisted species may occur because of river water intake placement, or design, or operation including blocked migration, de-watering river reaches or reduced stream flow, and entrainment from unscreened or improperly screened intakes . . . . None of the hatchery facilities employed to carry out the proposed artificial propagation programs de-water reaches used by listed fish for migration, spawning, or rearing."  2003 BiOp at 4-2.

95.     The 2003 BiOp contains an incidental take statement that states that "[a] quantifiable take may occur during broodstock collection activities and some investigational activities for the unlisted artificial propagation programs . . . . The incidental take of listed adult UCR spring Chinook salmon and UCR steelhead most often will be in the form of capture, handling, and subsequent release of protected species.  For activities that pose lethal threats to individuals, the estimated take level is provided."  2003 BiOp at 6-1.

96.     The 2003 BiOp then sets the Leavenworth NFH's expected annual take of ESA-listed adult UCR spring Chinook salmon at less than ten, and the expected

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 27-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

take of steelhead trout at twenty adults during USFWS-operated unlisted spring

Chinook salmon broodstock trapping activities.  2003 BiOp at 6-1, 6-2.

97.      The 2003 BiOp also contains numerous terms and conditions that the

USFWS must undertake in order for the exemption in section 7(o)(2) of the ESA

(permitting the agency to take endangered species) to apply.  16 U.S.C. §

1536(o)(2).   These terms and conditions are non-discretionary and binding.

98.      Among the terms and conditions, applicable to all agencies, including the

USFWS' operations at the Leavenworth National Fish Hatchery, set forth in the

2003 BiOp are the following:

- "Activities that encounter steelhead that are not authorized by other permits

  shall be limited to the levels indicated in Tables 6 through 11 of this

  Opinion.  The action agencies shall report any occurrence in which this level

  is exceeded to NMFS [now known as NOAA Fisheries] in the monthly and

  annual report."  2003 BiOp, p. 6-5.

- "The Action Agency must ensure that all ESA-listed species are handled

  carefully.  Should NMFS determine that a procedure provided for under this

  permit is no longer acceptable, the Action Agency must immediately cease

  such activity until an acceptable substitute procedure is identified and

  approved by NMFS."  2003 BiOp, p. 6-6.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 28-

- The Action Agency is responsible for obtaining all other federal, state, and local permits/authorizations needed for the proposed activities.  2003 BiOp, p. 6-6.

-  "In trapping operations directed at the collection of broodstock, the Action Agency shall apply measures that minimize the risk of harm to listed salmon and steelhead.  These measures include, but are not limited to: limitations on the duration (hourly, daily, weekly) of trapping in mainstem river areas to minimize capture and handling effects on listed fish; limits on trap holding duration of listed fish prior to release; application of procedures to allow safe holding, and careful handling and release of listed fish; and allowance for free passage of listed fish migrating through trapping sites in mainstem and tributary river locations when those sites are not being actively operated."  2003 BiOp, p. 6-7.

- "The Action Agency shall monitor the incidence of, and minimize capture, holding, and handling effects on, listed salmon and steelhead encountered during trapping.  The Action Agency shall carefully handle and immediately release upstream incidentally captured listed UCS spring Chinook salmon and UCR steelhead adults that are not intended for use as broodstock in

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 29-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

concurrently operated and otherwise authorized listed stock recovery

programs." 2003 BiOp, p. 6-7.

- "The Action Agency shall ensure that water intakes into artificial

propagation facilities be properly screened in compliance with 1995 NMFS

screening criteria and as per the 1996 addendum to those criteria (NMFS

1996). As an alternative, they shall comply with transitional criteria set

forth by NMFS in 1999 for juvenile fish screens constructed prior to the

establishment of the 1995 criteria (NMFS 1996), to minimize risks to listed

salmon and steelhead. The Action Agency shall inspect and monitor the

water intake screen structures at their hatchery facilities to determine if listed

salmon and steelhead are being drawn into the facility; the results of this

monitoring shall be included in annual reports." 2003 BiOp, p. 6-7.

- "The USFWS shall develop long-term solutions for fish passage issues

associated with Leavenworth NFH facilities and operations through the on-

going Icicle Creek Restoration Project EIS process. As an outcome of this

process, NMFS expects that the completion of the Icicle Creek Restoration

Project process will lead to passage of at least listed steelhead, and

potentially salmon adults and juveniles, into that portion of Icicle Creek

upstream of the Leavenworth NFH barrier." 2003 BiOp, p. 6-10.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 30-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

- "The USFWS shall immediately provide adult steelhead passage for unspawned steelhead above the hatchery barrier dam on Icicle Creek. To meet this requirement, the USFWS shall pass, by, sanctuary net, listed adult steelhead trapped in the fish ladder at Leavenworth NFH upstream of the hatchery barrier. The requirement shall apply until upstream passage for listed steelhead in Icicle Creek is provided through modifications or methods developed as an outcome of the on-going Upper Icicle Creek Restoration Process." 2003 BiOp, p. 6-10.

99.    In its 2003 BiOp, NOAA Fisheries explained that the effects on listed fish from water withdrawals from Icicle Creek for Leavenworth NFH use, among others, and the operation of the Hatchery's water intake structure would be addressed by NOAA Fisheries through a separate Section 7 consultation with USFWS.

100.    Upon information and belief, to date NOAA Fisheries has not addressed the operation of the Hatchery's water intake structure and water withdrawal in a separate Section 7 consultation with USFWS.

101.    In its 2003 BiOp, NOAA Fisheries also explained that effects on listed fish from operation of the passage barriers would be addressed by NOAA Fisheries through a separate Section 7 consultation with USFWS. In fact the 2003 BiOp

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

1   explicitly states that "an effects analysis and jeopardy determination for this

2   portion of the Leavenworth NFH operation (passage barriers) will not be rendered

3   in this Opinion." 2003 BiOp 4-22.   While analysis of barriers to fish passage,

4   therefore, was not directly part of the 2003 BiOp, NOAA Fisheries did state that it

5   expected that free upstream passage for listed UCR steelhead juveniles and adults

6

7   must be provided at the Leavenworth Dam.

8   102.    To date, the Hatchery has failed to provide unobstructed passage for listed

9

10  UCR steelhead juveniles and adults past the Headgate Dam.

11      **The Hatchery's Continued Take of Steelhead in the Natural Channel of
    Icicle Creek**

12

13  103.    Upon information and belief, current Hatchery operations are taking

14  steelhead trout in the natural channel of Icicle Creek.  Washington Trout has

15

16  documented this take and has on several occasions notified the Hatchery and

17  NOAA Fisheries of the situation.  For example, within the last month Washington

18  Trout video recorded steelhead jumping into the Headgate Dam before the racks

19  and stoplogs were placed in Dam 5.  The north gate of the Headgate Dam was

20

21  closed and the south gate was open approximately 10 inches, thereby making it

22  impassable to fish upstream and downstream.

23

24

25

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 32-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

1    104.    Prior to the video taping, a member of Washington Trout observed

2    steelhead jumping at the Headgate Dam at an occurrence of approximately one

3    every 2½ minutes for forty-five minutes.

4

5    105.    Additionally, by impeding natural water flow through the natural section of

6    Icicle Creek between the Headgate Dam and Dam 5, the Hatchery is currently

7    harming or harassing steelhead redds located in the natural channel of Icicle Creek

8    between the Headgate Dam and the natural channel immediately below the

9    spillway dam.  Each redd can contain thousands of steelhead eggs.

10

11    106.    Section 9(a)(1)(B) of the ESA provides that "with respect to any

12    endangered species of fish or wildlife . . .  it is unlawful for any person subject of

13    the jurisdiction of the United States to take any such species within the United

14    States . . . ."  16 U.S.C. § 1538(a)(1)(B).  Under Section 3 of the ESA , "the term

15    'fish and wildlife' means any member of the animal kingdom, including without

16    limitation any mammal, fish, bird. . . , amphibian, reptile, mollusk, crustacean,

17    arthropod or other invertebrate, and includes any part, product, egg, or offspring

18    thereof, off the dead body or parts thereof." 16 U.S.C. § 1932(8).  The 2003 BiOp

19    does not include an incidental take statement covering the Hatchery's take of

20

21    steelhead eggs. Accordingly, these takes are in violation of Section 9 of the ESA.

22

23    16 U.S.C. § 1938.

24

25

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

107.     Additionally, upon information and belief, the Hatchery has not ensured that all ESA-listed species are handled carefully.  Washington Trout recently video recorded several steelhead trout trapped in the natural channel of Icicle Creek after the Hatchery closed the Headgate Dam and Dam 5 to fish passage.   The trapped fish species were not allowed passage upstream or downstream.  Additionally, members of Washington Trout observed steelhead spawning in the portion of Icicle Creek between Dam 5 and the Headgate.   The Hatchery was informed of this situation and upon information and belief the USFWS has neither monitored the number of steelhead taken to determine whether the current fish propagation activities are inflicting a higher level of take on adult steelhead than the number expected in the 2003 BiOp, nor taken actions to ensure that these ESA-listed species are handled carefully.

108.     The Incidental Take Statement in the 2003 BiOp does not consider or address harm to listed fish and fish eggs isolated in the historic channel through the Hatchery's continued blocking of fish passage and dewatering of the natural channel.

109.     These listed fish are harmed, among other reasons, because they are prevented from reaching better habitat upstream.

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

110.    Likewise, the Hatchery's operation of the Headgate Dam and Dam 5 have excluded fish upstream and downstream of the natural channel from entering the natural channel.  For example, by restricting movements of listed fish, the USFWS has harmed juvenile and adult life stages of the listed fish throughout Icicle Creek by disrupting pre-spawning behavior, interfering with the ability of spawners to find one another, and by restricting the ability of rearing juveniles to seek optimal habitats within the segment of Icicle Creek that spans the area immediately upstream and downstream of the historical channel. These actions impair the chances of listed fish to successfully spawn.

111.    Many salmon and steelhead die after spawning and their carcasses are an important source of nutrients to the aquatic and riparian ecosystem.  By restricting fish movements, the USFWS has reduced the number of returning fish and is, in essence, starving the upper Icicle Creek watershed of nutrients, significantly degrading the habitat, and harming listed fish reaching upper Icicle Creek, or listed bull trout that are year-round residents of upper Icicle Creek.

112.    Whether listed or not, fish carcasses, fish eggs, and newly hatched fish are all important food sources for listed fish and non-listed fish and aquatic life.  By restricting movement of listed and non-listed fish, USFWS has significantly

WASHINGTON TROUT'S COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF  - 35-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

degraded the upper Icicle Creek habitat and thus harmed listed fish by limiting this food source.

113.     Sufficient numbers of spawning fish can improve habitat by physical movement of gravel in the stream bed.  By preventing fish from reaching the upper Icicle Creek watershed, the USFWS has degraded the habitat above the Hatchery, thus harming listed fish.

114.     Further, as of June 16, 2005, the Hatchery reports on its website that 1971 adult spring Chinook salmon had returned to the Hatchery; that 611 of these fish had been "excessed," and that 1360 adult spring Chinook salmon were "on station." USFWS, 2005 Adult Spring Chinook Salmon Returns, http://leavenworth.fws.gov/returns.htm (last visited June 16, 2005). Despite having collected this number of fish, the Hatchery continues to block fish passage for all other fish, including threatened and endangered species, by keeping the stop logs in Dam 5 and diverting water into the manmade canal via the Headgate Dam.

115.     These actions are inconsistent with the Terms and Conditions of the Hatchery's Incidental Take Statement in the 2003 BiOp which require the Hatchery to apply measures to minimize the risk of harm to listed salmon and steelhead, including: limitations on duration (hourly, daily and weekly) of trapping in the mainstem river areas, and allowance for free passage of listed fish migrating

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

though trapping sites in mainstem river locations when the site is not being actively operated.

### CLAIMS FOR RELIEF

#### First Claim for Relief (ESA):  Failure to Comply with the Terms and Conditions of the Incidental Take Statement (Screening)

116.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-115 of this Complaint.

117.    By failing to bring its water intake screening system into compliance with NOAA Fisheries screening criteria, Defendants have failed to comply with a mandatory term of its Incidental Take Statement in the 2003 BiOp.

118.    Because Defendants have failed to comply with this Term and Condition of its Incidental Take Statement, the Hatchery is taking listed species, including endangered steelhead trout in violation of the ESA.

#### Second Claim for Relief (ESA):  Take of Listed Fish in the Natural Channel of Icicle Creek Without an Incidental Take Statement

119.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-118 of this Complaint.

120.    Concurrent with broodstock collection efforts, and at other times of the year when the Hatchery is blocking fish passage at Dam 5, listed fish including endangered steelhead trout and threatened bull trout that are not attracted to the

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 37-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

Hatchery's fish ladder are otherwise blocked from migrating past the fish trapping area.

121.    Concurrent with broodstock collection efforts, and at other times of the year when the Headgate Dam is closed or open only partially, listed fish including endangered steelhead trout and threatened bull trout, are blocked from migrating past the Headgate Dam and are otherwise trapped in the natural channel of icicle Creek between the Headgate Dam and Dam 5.

122.    Concurrent with broodstock collection efforts, and at other times of the year when the Headgate Dam is closed or open only partially, the Hatchery is harming steelhead redds located in the natural channel of Icicle Creek between the Headgate Dam and the natural channel immediately below the spillway dam.  Each redd can contain thousands of steelhead eggs.

123.    By blocking stream passage and diverting flows into the Hatchery's manmade canal as described, the Hatchery is taking listed fish, including endangered steelhead trout, in violation of the ESA.

**Third Claim for Relief (ESA): Take of Bull Trout Without an Incidental Take Statement**

124.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-123 of this Complaint.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 38-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

125.    By blocking stream passage and diverting flows into the Hatchery's manmade canal, the Hatchery is taking threatened bull trout in violation of the ESA.

126.    By failing to screen its water intake system the Hatchery is taking threatened bull trout in violation of the ESA.

127.    By handling threatened bull trout without an Incidental Take Statement the Hatchery is taking threatened bull trout in violation of the ESA.

**Fourth Claim for Relief (ESA):  In the Alternative, if Take of Listed Fish In the Natural Channel is Covered by the Incidental Take Statement, the Hatchery has Failed to Comply with the Terms and Conditions of the Incidental Take Statement (Failure to Monitor and Report)**

128.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-127 of this Complaint.

129.    By failing to adequately monitor and report the number of steelhead trout being taken in the natural channel of Icicle Creek during broodstock collection efforts, the Hatchery has failed to comply with a mandatory term of its Incidental Take Statement.

130.    Because the Hatchery has failed to comply with these Terms and Conditions of its Incidental Take Statement, the Hatchery is taking endangered species, including steelhead trout in violation of the ESA.

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

**<u>Fifth Claim for Relief (ESA): In the Alternative, if Take of Listed Fish in the Natural Channel is Covered by the Incidental Take Statement, the Hatchery has Failed to Comply with the Terms and Conditions of the Incidental Take Statement (Failure to Minimize the Capture and Handling Effects; Failure to Provide Immediate Fish Passage)</u>**

131.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-130 of this Complaint.

132.    In violation of its Incidental Take Statement, the Hatchery has failed to limit the duration of its trapping activities to minimize the capture and handling effects on listed fish.

133.    In violation of its Incidental Take Statement, the Hatchery has failed to allow for free passage of listed fish migrating past the trapping site when trapping for broodstock is not being actively operated.

134.    The Hatchery has also failed to provide for immediate passage for unspawned adult steelhead isolated in the main channel and blocked below Dam 5 to above the Headgate Dam on Icicle Creek.

135.    By failing to comply with the Terms and Conditions of the Incidental Take Statement, the Hatchery is taking endangered species in violation of the ESA.

**<u>Sixth Claim for Relief (ESA): The Hatchery Must Reinitiate Consultation for the Icicle Creek Restoration Project</u>**

136.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-135 of this Complaint.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF  - 40-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

137.    Rather than complete the Icicle Creek Restoration Project on the timeline planned, the USFWS left the Headgate Dam and Dam 5 in place, and is currently planning to initiate a second phase of the Restoration Project.

138.    The USFWS is also concurrently planning to construct a related Water Supply System Rehabilitation Project.  That Water Supply Rehabilitation project includes elements to facilitate fish passage that are related to the Restoration project.

139.    Neither the 2002 NOAA Fisheries Restoration BiOp nor the 2002 USFWS Restoration BiOp considered the impacts of an additional dewatering of the natural channel of Icicle Creek or the manmade canal for a phased construction or restoration project.

140.    Neither the 2002 NOAA Fisheries Restoration BiOp nor the 2002 USFWS Restoration BiOp considered the impacts of construction, or of modification to, the fish screen on the water intake facility, including the proposed pump-back of Hatchery wastewater to facilitate fish passage.

141.    The USFWS has obtained significant new information concerning bull trout migration in Icicle Creek that it did not consider in the 2002 Restoration BiOp.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 41-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA  98145
(206) 543-3434

142.    By failing to reinitiate consultation on the Restoration Project, the

Hatchery is violating the ESA.

**Seventh Claim for Relief (ESA): The Hatchery Must Initiate
Consultation with NOAA Concerning the Water System Rehabilitation
Project**

143.    Washington Trout realleges and incorporates by reference each and every

allegation set forth in paragraphs 1-142 of this Complaint.

144.    As part of the Water Supply System Rehabilitation Project, the Hatchery

proposes to construct a new fish ladder and screening facility at the Hatchery's

water intake on Icicle Creek and construct a wastewater pump-back system to

discharge a portion of the water used at the Hatchery to a point just downstream of

its intake.

145.    Concurrently, the Hatchery plans to update the water delivery system that

withdraws water from Icicle Creek.

146.    Pursuant to Section 7(c) of the ESA, the USFWS prepared a Biological

Assessment to determine whether identified endangered and threatened species

will be adversely affected by this proposed major federal action.

147.    The USFWS 2003 BA found that the Waste Supply System Rehabilitation

Project "may affect but is not likely to adversely affect UCR steelhead in Icicle

Creek."

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE  BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

148.      NOAA Fisheries must concur with the USFWS' determination.

149.      By failing to failing to complete consultation with NOAA Fisheries regarding the Water Supply Rehabilitation Project, USFWS is violating the ESA.

**Eighth Claim for Relief (NEPA): The Hatchery Must Supplement the EIS for the Restoration Project**

150.      Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-149 of this Complaint.

151.      The FEIS for the Restoration Project did not consider, and could not have considered, new information concerning the extent to which the design of the proposed fish sorter, which restricts flows through much of the year, is consistent with the purpose and need for the Restoration Project, and the goals stated in the Record of Decision.

152.      The FEIS for the Restoration Project did not consider, and could not have considered, new information concerning the extent to which the design of the fish ladder at the Headgate Dam, and the placement of the gate in the north gate, reduces flows in the natural channel and is therefore inconsistent with the purpose and need for the Restoration Project and the goals stated in the Record of Decision.

153.      The FEIS for the Restoration Project did not consider, and could not have considered, new information concerning bull trout migration and the importance of fish passage to allow bull trout migration all year.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 43-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

154.    The FEIS for the Restoration Project did not consider, and could not have considered, new information concerning the extent to which the design of the proposed fish sorter and modifications to the Headgate Dam will effect the environment, including the potential to further degrade habitat, and not allow for flows that will provide for natural flushing.

155.    Based on this new information, changes in circumstances including timing, and in order to avoid improper segmentation of closely related projects, the Hatchery must supplement the FEIS for the Restoration Project before proceeding with a second phase of construction.

**Ninth Claim for Relief (NEPA): The EA for the Water Supply Rehabilitation Project is Inadequate (Inadequate Analysis)**

156.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-155 of this Complaint.

157.    The FEA for the Water Supply Rehabilitation Project failed to adequately consider the effects on the environment of untreated and undiluted Hatchery wastewater being discharged into Icicle Creek approximately 1.5 miles upstream of the Hatchery.

158.    The FEA for the Water Supply Rehabilitation Project failed to adequately consider the effects on instream resources when untreated and undiluted Hatchery

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

wastewater being discharged into Icicle Creek approximately 1.5 miles upstream of the Hatchery will make up a significant portion of the flow in Icicle Creek.

159.    The FEA for the Water Supply Rehabilitation Project failed to adequately consider the effects on the environment, including animals and crops, when untreated and undiluted Hatchery wastewater is pumped-back to the Irrigation Company's intake and used in place of Icicle Creek water.

160.    The FEA for the Water Supply Rehabilitation Project failed to adequately consider the effects on the environment when untreated and undiluted Hatchery wastewater is pumped-back to the Irrigation Company's intake and the carry water is subsequently discharged to the Wenatchee River.

161.    For these reasons, the FEA for the Water Supply Rehabilitation project is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

### Tenth Claim for Relief (NEPA):  The EA for the Water Supply Project Violates NEPA (Improper Segmentation)

162.    Washington Trout realleges and incorporates by reference each and every allegation set forth in paragraphs 1-161 of this Complaint.

163.    While the FEA for the Water Supply Rehabilitation Project purports to incorporate by reference and build upon the FEIS for the Restoration project, the FEA failed to adequately analyze the cumulative effects of the two projects and

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 45-

improperly segments, indeed fails to recognize and acknowledge the close

relationship between, the two projects.

164.    The FEA for the Water Supply Rehabilitation Project failed to adequately

consider in one EA or EIS, the USFWS' planned use of pumped-back untreated,

undiluted Hatchery wastewater for the fish sorter—planned to be constructed in

Phase II of the River Restoration Project.

165.    The FEA for the Water Supply Rehabilitation Project failed to adequately

consider in one EA or EIS, the relationship and environmental effects of the

USFWS' plan to pump-back untreated, undiluted wastewater to Icicle Creek in

connection to flows in the natural channel and the USFWS' operations and

activities to divert water from the natural channel into its manmade canal.

166.    The FEA for the Water Supply Rehabilitation Project failed to adequately

consider in one EA or EIS, the relationship and environmental effects of the

USFWS' plan to pump-back untreated wastewater to Icicle Creek to the Hatchery's

diversion of flows from Icicle Creek to the manmade canal to recharge the

Hatchery's groundwater supply.

167.    The FEA improperly segmented the USFWS' analysis of environmental

impacts relating to the Water Supply Rehabilitation Project from Phase II of the

Restoration Project.

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 46-

168.    For these reasons, the FEA for the Waster Supply Rehabilitation Project is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law.

## PRAYER FOR RELIEF

**WHEREFORE**, Washington Trout respectfully requests that the Court:

A.    Declare that USFWS/Leavenworth NFH has not complied with the terms and conditions of the Incidental Take Statement and is in violation of Section 9 of the ESA by failing to bring the Leavenworth NFH's water intake screening system into compliance with NOAA Fisheries' screening criteria;

B.    Declare that USFWS is in violation of Section 9 of the ESA by taking endangered steelhead trout, endangered spring Chinook salmon, and threatened bull trout;

C.    In the alternative, declare that USFWS/Leavenworth NFH is violating Section 9 of the ESA by failing to monitor and report whether it is exceeding the allowed incidental take of endangered steelhead trout and/or spring Chinook salmon established in the 2003 BiOp;

D.    In the alternative, declare that USFWS is in violation of Section 9 of the ESA by failing to comply with the terms and conditions of the 2003 BiOp and

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 47-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

taking endangered steelhead trout and/or spring Chinook salmon in violation of the ESA;

E.    Declare that USFWS is in violation of Section 7 of the ESA by failing to re-initiate and complete consultation with NOAA Fisheries and USFWS prior to undertaking Phase II of the Icicle Creek Restoration Project;

F.    Declare that USFWS is in violation of Section 7 of the ESA by failing to initiate and complete consultation with NOAA Fisheries prior to construction of the Water Supply System Rehabilitation Project including the modification of the fish screen on the water intake facility;

G.    Order USFWS to immediately comply with the requirements of the ESA; including, but not limited to:

1)    providing for upstream and downstream passage for threatened and endangered species at all life stages and at all times of the year;

2)    complying with the applicable terms and conditions of the Incidental Take Statement in the 2003 BiOp, including providing for a legal water intake screen; and

3)    conducting and completing adequate consultations under the ESA regarding the operations and activities of the Hatchery on federally listed threatened and endangered species;

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 48-

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

H.      Enjoin the Hatchery from conducting further operations until compliance with the ESA is achieved;

I.      Grant such restraining orders and/or such preliminary or permanent injunctive relief as Plaintiff may from time to time request during the resolution of this case to ensure that Defendants do not irreparably injure threatened and endangered species during the resolution of the merits of this case;

J.      Declare that USFWS has failed to comply with NEPA by failing to supplement its FEIS for the Icicle Creek Restoration Project and/or improperly segmenting its consideration of the Restoration Project from its analysis of the Water Supply Rehabilitation and pump-back project;

K.      Declare that the USFWS failed to comply with NEPA by preparing an inadequate EA for the Water Supply Rehabilitation and pump-back Project;

L.      Order USFWS to comply with the requirements of NEPA by preparing a comprehensive analysis of Hatchery impacts, including impacts of Phase II of the Icicle Creek Restoration Project and the Water Supply Restoration Project;

M.      Award Washington Trout its reasonable attorneys' fees, costs of court, and other expenses necessary for the preparation and litigation of this case under the ESA and the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq.; and

UNIVERSITY OF WASHINGTON SCHOOL OF LAW
KATHY AND STEVE BERMAN ENVIRONMENTAL LAW CLINIC
WILLIAM H. GATES HALL, P.O. BOX 85110
SEATTLE, WA 98145
(206) 543-3434

N.    Grant such additional relief as the Court deems just and proper.

DATED this 16th day of June, 2005.

Respectfully submitted,

s/ Michael J. Robinson-Dorn
WSBA # 29856
Assistant Professor of Law and Director,
Kathy and Steve Berman Environmental Law Clinic
University of Washington School of Law
William H. Gates Hall, P.O. Box 85110
Seattle, WA 98145
206.616.7729
mjrd@u.washington.edu

Rachel A. Gold, Student Advocate
Tyson C. Kade, Student Advocate
Kathy and Steve Berman Environmental Law Clinic
University of Washington School of Law
William H. Gates Hall, Box 353020
Seattle, WA 98195

WASHINGTON TROUT'S COMPLAINT FOR
DECLARATORY AND INJUNCTIVE RELIEF   - 50-