Richard A. Smith, WSBA #21788
Brian A. Knutsen, WSBA #38806
Smith & Lowney, PLLC
2317 East John St.
Seattle, WA 98112
Tel: (206) 860-2883; Fax: (206) 860-4187

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

|  |  |
|---|---|
| WILD FISH CONSERVANCY | No. CV-05-181-LRS |
| Plaintiff, | SECOND SUPPLEMENTAL COMPLAINT |
| v. | |
| DIRK KEMPTHORNE, in his official capacity as Secretary of the Interior; U.S. FISH & WILDLIFE SERVICE; H. DALE HALL, in his official capacity as the Director of the U.S. FISH & WILDLIFE SERVICE; JULIE COLLINS, in her official capacity as manager of the Leavenworth National Fish Hatchery Complex, | |
| Defendants. | |

INTRODUCTION

1.    Wild Fish Conservancy brings this action for declaratory and injunctive relief to require the United States Fish and Wildlife Service ("USFWS") to comply with the Endangered Species Act ("ESA"), and to enjoin the Leavenworth National Fish Hatchery ("Hatchery"), a USFWS facility, from continuing to take native stocks of threatened bull trout in violation of the ESA.

SECOND SUPPLEMENTAL COMPLAINT - 1

2.     Wild Fish Conservancy also brings this action to require the USFWS to comply with the National Environmental Policy Act ("NEPA") before undertaking major federal actions at the Hatchery, including modification of structures blocking fish passage, the construction of a major water intake and wastewater pump-back project, and the adoption of a five-year management and operations plan, without an analysis of the direct, indirect, and cumulative impacts of those actions on the environment.

JURISDICTION AND VENUE

3.     This Court has jurisdiction over Wild Fish Conservancy's ESA and NEPA claims under 28 U.S.C. § 1331 (federal question), 16 U.S.C. § 1540(g) (ESA citizen suit provision), and 5 U.S.C. §§ 701-706 (Administrative Procedure Act).  The requested relief is also proper under 28 U.S.C. § 2201 (declaratory relief) and 28 U.S.C. § 2202 (injunctive relief).

4.     As required by the ESA, 16 U.S.C. § 1540(g), Plaintiff Wild Fish Conservancy has furnished Defendants with written notices of intent to sue more than sixty days ago in letters postmarked March 17, 2005, and October 18, 2006. A copy of the later of these notices of intent to sue is attached to this complaint as Exhibit 1, and is incorporated herein by reference.  Defendants have not remedied the alleged violations; they are ongoing and likely to continue.

SECOND SUPPLEMENTAL COMPLAINT - 2

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

5.      Venue is properly vested in this Court under 16 U.S.C. §

1540(g)(3)(A) and 28 U.S.C. § 1391(e) because the Hatchery is located in this

judicial district, a substantial part of the events or omissions giving rise to the

claims occurred in this district, and, to the extent that real property is involved in

this action, such property is located in this district.

PARTIES

6.      Plaintiff Wild Fish Conservancy is a non-profit corporation

recognized as a tax-exempt, or 501(c)(3), organization that has its principal place

of business in Duvall, Washington.  Wild Fish Conservancy is dedicated to the

preservation and recovery of Washington's native fish species and the ecosystems

upon which those species depend.  Wild Fish Conservancy brings this action on

behalf of itself and its approximately 2,400 members.  Wild Fish Conservancy

changed its name from "Washington Trout" in 2007.

7.      As an environmental watchdog, Wild Fish Conservancy actively

informs the public on matters affecting water quality, fish, and fish habitat in the

State of Washington trough publications, commentary to the press, and

sponsorship of educational programs.  Wild Fish Conservancy also conducts field

research on wild fish populations and has designed and implemented habitat

restoration projects.  Wild Fish Conservancy has lobbied, litigated, and publicly

SECOND SUPPLEMENTAL COMPLAINT - 3

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WA 98112
(206) 860-2883

commented on federal and state actions that affect state waters. Wild Fish Conservancy routinely seeks to compel governmental agencies, including the USFWS, to follow the laws designed to protect native fish species, particularly including threatened and endangered species.

8.      Wild Fish Conservancy's members derive scientific, recreational, health, conservation, spiritual, and aesthetic benefits from the preservation and protection of native fish species. More specifically, Wild Fish Conservancy's members spend time in areas, including the Icicle Creek area, that are adversely affected by Defendants' failures to comply with environmental protection laws, and its members reside near and regularly visit these areas, including the Icicle Creek area.

9.      Wild Fish Conservancy's members use Icicle Creek for recreation and spiritual renewal. These members derive recreational, scientific and aesthetic benefits from the existence of a healthy ecosystem and from wild fish, including bull trout, in Icicle Creek. These members observe, study, photograph, and appreciate Icicle Creek's native fish populations. In addition, these members have met with, negotiated with, and worked closely with USFWS personnel concerning native fish passage issues and Hatchery operations.

SECOND SUPPLEMENTAL COMPLAINT - 4

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WA 98112
(206) 860-2883

10.     Wild Fish Conservancy members have also suffered procedural and informational harms connected to their substantive, conservation, recreation, and scientific activities resulting from Defendants' violations of environmental laws. These members rely in part on ESA consultation and NEPA evaluation processes to protect threatened and endangered species from injuries inflicted by Hatchery activities.

11.     The past, present, and future enjoyment of these benefits, including the recreational, aesthetic, and scientific interests of Wild Fish Conservancy members, has been, is being, and will continue to be harmed by Defendants' failures to comply with environmental laws.  Processes required by these laws provide decision makers, Wild Fish Conservancy, and the public with essential information regarding the effects of government actions on threatened and endangered species.

12.     These injuries are actual, concrete injuries fairly traceable to Defendants' violations of environmental laws that the Court may remedy by declaring that Defendants' activities are illegal and enjoining Defendants from taking further illegal action.

SECOND SUPPLEMENTAL COMPLAINT - 5

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

13.     Defendant Dirk Kempthorne is the Secretary of the Interior and, as such, is the federal official ultimately responsible for ensuring that the USFWS complies with the ESA and NEPA.

14.     Defendant USFWS is an executive branch department within the Department of the Interior.  USFWS is responsible for administering the provisions of the ESA and is the agency that owns and operates the Hatchery.

15.     Defendant H. Dale Hall is the Director of the USFWS.

16.     Defendant Julie Collins is the Complex Manager of the Hatchery and, as such, is responsible for the Hatchery's compliance with environmental laws.

STATUTORY BACKGROUND

The Endangered Species Act

17.     ESA is a federal statute enacted to provide a program to conserve threatened and endangered species and to protect the ecosystems upon which those species depend.  16. U.S.C. § 1531(b).  To this end, ESA requires the Secretaries of the Interior and of Commerce to list such species as threatened or endangered.  16 U.S.C. § 1533.

18.     Section 9 of the ESA and its implementing regulations prohibit any person, including federal agencies, from "taking" a threatened or endangered species.  16 U.S.C. § 1538(a)(1); 50 C.F.R. § 227.21.  "Taking" is defined broadly

SECOND SUPPLEMENTAL COMPLAINT - 6

under ESA to include harassing, harming, pursuing, hunting, shooting, wounding, killing, trapping, capturing, or collecting, or attempting to engage in any such conduct regarding a protected species either directly or by degrading its habitat sufficiently to impair essential behavior patterns.  16 U.S.C. § 1532(19); 50 C.F.R. § 222.102.

19.    "Take" by federal agencies is permitted if, upon completion of formal consultation, the agency receives an incidental take statement under Section 7(b)(4).  An incidental take statement specifies the impact of any incidental take, provides for reasonable and prudent measures necessary to minimize impacts, and sets forth terms and conditions that must be followed.  16 U.S.C. § 1536(b)(4).

20.    Section 7(a)(2) of ESA requires all federal agencies, including USFWS, to "insure that any action authorized, funded or carried out by such agency … is not likely to jeopardize the continued existence of any endangered or threatened species."  16 U.S.C. § 1536(a)(2).  Regulations implementing this section define "jeopardize the continued existence of" as: "to engage in an action that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild by reducing the reproduction, numbers, or distribution of that species."  50 C.F.R. § 402.02.  "Jeopardy" is evaluated on the level of a "distinct population segment" of

SECOND SUPPLEMENTAL COMPLAINT - 7

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

a protected species.  16 U.S.C. § 1532(16).  To carry out this mandate, the agency proposing to undertake the action (the "action agency") must consult with the National Marine Fisheries Service ("NMFS"), the delegated agency of the Secretary of Commerce, or with the USFWS, the delegated agency of the Secretary of the Interior, (the "expert agency") depending on the affected species, whenever the action agency's actions "may affect" a listed species.  16 U.S.C. § 1536(a)(2).

21.    When an action agency's actions "may affect" a listed species, "formal consultation" under Section 7(a)(2) is required unless the expert agency agrees that the actions are not likely to adversely affect the listed species.  Id; 50 C.F.R. § 402.14.  Formal consultation is concluded by the expert agency's issuance of a biological opinion.  50 C.F.R. § 402.14(l).  In a formal consultation, the expert agency must review all relevant information and use "the best available scientific and commercial data available," evaluate the current status of the listed species, evaluate the effects of the action and cumulative effects on the listed species, formulate its biological opinion as to whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species, identify reasonable and prudent alternatives if such jeopardy is found, and formulate an incidental take statement.  50 C.F.R. § 402.14(g).  Similarly, the biological opinion must include a summary of the information on which the

SECOND SUPPLEMENTAL COMPLAINT - 8

opinion is based, a detailed discussion of the effects of the action, the expert

agency's opinion on jeopardy and, if jeopardy is found, reasonable and prudent

alternatives to the action, and the incidental take statement.  50 C.F.R. § 402.14(h).

22.    In turn, the incidental take statement must specify the impact, "i.e., the

amount or extent," of incidental taking authorized, specify the reasonable and

prudent measures necessary or appropriate to minimize such impact, set forth the

terms and conditions (including, but not limited to reporting requirements) that the

action agency must meet to implement the reasonable and prudent measures, and

satisfy other requirements.  50 C.F.R. § 402.14(i).  To monitor the impacts of

incidental take, the action agency must report the progress of the action and its

impact on the species as specified in the incidental take statement.  50 C.F.R. §

402.14(i)(3).

23.    If, during the course of the action, the amount or extent of incidental

taking specified by the incidental take statement is exceeded, the action agency

must reinitiate consultation immediately.  50 C.F.R. § 402.14(i)(4).  Reinitiation of

consultation is also required if the new information reveals that the action may

affect listed species in a manner not previously considered or if the identified

action is subsequently modified in a manner that causes an effect to the listed

species that was not considered in the biological opinion.  50 C.F.R. § 402.16.

SECOND SUPPLEMENTAL COMPLAINT - 9

Smith & Lowney, P.L.L.C.
2317 east john street
Seattle, WA 98112
(206) 860-2883

24.    The Section 7(a)(2) obligation of an action agency to insure that its

actions are not likely to jeopardize the continued existence of a listed species, or a

distinct population segment of a listed species, exists independently of the action

agency's consultation responsibilities.  In other words, a "no jeopardy" biological

opinion from an expert agency does not alone indicate that the action agency has

satisfied this Section 7(a)(2) obligation.  See Resources Limited, Inc. v. Robertson,

35 F.3d 1300, 1304 (9th Cir. 1993).

25.    Any taking of a threatened or endangered species that is in compliance

with the terms and conditions specified in a biological opinion shall not be

considered to be a prohibited taking of the species concerned.  16 U.S.C. §

1536(o)(2).  Any taking occurring in violation of the terms and conditions of an

incidental take statement, or in excess of that permitted under the incidental take

statement, is a violation of Section 9 of the ESA.  16 U.S.C. § 1538.

<u>The National Environmental Policy Act</u>

26.    NEPA is the "basic national charter for protection of the

environment."  40 C.F.R. § 1500.1.  Its purposes are to "help public officials make

decisions that are based on understanding of environmental consequences, and to

take actions that protect, restore, and enhance the environment," and to "insure that

SECOND SUPPLEMENTAL COMPLAINT - 10

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

environmental information is available to public officials and citizens before

decisions are made and before actions are taken." Id. at § 1500.1(b)-(c).

26.    To accomplish these purposes, NEPA requires all agencies of the

federal government of prepare a "detailed statement" regarding all "major federal

actions significantly affecting the quality of the human environment," 42 U.S.C. §

4332(C), including situations where several separate actions may have a

cumulatively significant impact on the environment.  40 C.F.R. § 1508.27(b)(7).

This "detailed statement" is commonly known as an Environmental Impact

Statement ("EIS").  Council on Environmental Quality ("CEQ") regulations list a

number of factors that an agency must consider in deciding whether to prepare an

EIS.  Id § 1508.27.  All related, similar, interconnected, or interdependent actions,

including proposed actions that are similar in geographic scope or extent, or that

will have similar environmental impacts, must be analyzed together in an EIS.  Id §

1501 et seq.  An agency may not avoid preparation of an EIS by "breaking …

down [its action] into small component parts."

27.    Before determining whether the proposed action requires an EIS, the

agency may prepare an environmental assessment ("EA").  Id. § 1501.4.  If an

agency decides not to prepare an EIS, it must prepare a finding of no significant

SECOND SUPPLEMENTAL COMPLAINT - 11

impact ("FONSI"), which explains the agency's reasons for its decision.  Id. §

1501.4.

28.    NEPA further provides that agencies "shall . . . study, develop, and

describe appropriate alternatives to recommended courses of action in any proposal

which involves unresolved conflicts concerning alternative uses of available

resources." 42 U.S.C. § 4332(2)(E). This requirement is independent of the

determination whether or not to prepare an EIS.  An alternatives analysis must be

prepared if an EA is required.

29.    Even after a NEPA process is completed, where an agency learns of

"significant new circumstances" or new "information relevant to environmental

concerns and bearing on the proposed action or its impacts," the agency must

undertake further review under NEPA.  40 C.F.R. § 1502.9(c).

<u>The Administrative Procedure Act</u>

30.    The Administrative Procedure Act ("APA") authorizes courts

reviewing agency action to hold unlawful and set aside final agency action,

findings, and conclusions that are arbitrary and capricious, an abuse of discretion,

or otherwise not in accordance with law.  5 U.S.C. § 706(2)(A).  EISs and EAs

issued under NEPA and biological opinions issued under ESA are reviewed under

this provision of the APA.

SECOND SUPPLEMENTAL COMPLAINT - 12

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WA 98112
(206) 860-2883

FACTUAL BACKGROUND

<u>Icicle Creek</u>

31.    Icicle Creek originates in the Cascade Mountains in Washington State and is a fourth-order tributary to the Wenatchee River, which is a tributary to the Columbia River.

32.    Icicle Creek contains natural populations of steelhead trout (*Oncorhynchus mykiss*), spring Chinook salmon (*Oncorhynchus tshawytscha*), bull trout (*Salvelinus confluentus*), and other fish species.

33.    In the upper Columbia River, an area that includes Icicle Creek, steelhead trout are listed as a threatened species and spring Chinook salmon are listed as an endangered species under the ESA.  Both of these species are managed by NMFS.  Spring Chinook salmon produced by the Hatchery are not protected under the ESA.

34.    In the upper Columbia River, bull trout are listed as threatened species under the ESA as part of the Columbia River distinct population segment of threatened bull trout, and are managed by the USFWS.

35.    Icicle Creek is listed on the State of Washington's Clean Water Act Section 303(d) list as violating state water quality standards for temperature,

SECOND SUPPLEMENTAL COMPLAINT - 13

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

dissolved oxygen, and pH. The Hatchery is among the entities identified as contributing to the degraded condition of Icicle Creek.

36.     As explained more fully below, Defendants' actions have degraded, and continue to degrade, the ecosystem in Icicle Creek. Likewise, Defendants' actions block and interfere with fish passage for threatened bull trout in Icicle Creek.

### The Leavenworth National Fish Hatchery

37.     Constructed in 1939 and 1940, the Leavenworth National Fish Hatchery is located approximately three miles south of the city of Leavenworth, Washington, on the banks of Icicle Creek.

38.     Originally designed to maintain salmon stocks blocked by construction of the Grand Coulee Dam on the Columbia River, the Hatchery initially reared fish in holding ponds constructed in a one mile stretch of natural channel of Icicle Creek. Hatchery operations at that time were conducted principally within this stretch of Icicle Creek.

39.     The most upstream of the holding pond structures, the headgate dam or "dam 2," was used to control water flow over the fish holding ponds and divert excess water into a 4,000 foot-long manmade canal sending water over a spillway dam where it is returned to Icicle Creek.

SECOND SUPPLEMENTAL COMPLAINT - 14

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WA 98112
(206) 860-2883

40.    Fish migrations to areas above the Hatchery were blocked by the spillway at the base of the canal and by a series of dams and weirs in the natural channel of Icicle Creek.  Included among these blocking structures in the natural channel was "dam 5," located just upstream of the confluence of the natural channel and the spillway dam.

41.    Over time, the intermediate structures between the headgate dam (dam 2) and dam 5 were abandoned, and the USFWS no longer used the natural channel of Icicle Creek for Hatchery fish propagation.  Unfortunately, these abandoned structures were left in place for decades, where they continued to block native fish passage.

42.    Although the Hatchery no longer uses the natural channel of Icicle Creek to raise fish, the Hatchery continues to use the headgate dam (dam 2) to divert water from Icicle Creek's natural channel into the Hatchery's manmade canal.  At most times of the year, the Hatchery's diversion of water into its manmade canal and/or other structures significantly dewaters the natural channel of Icicle Creek between the headgate dam (dam 2) and dam 5.

43.    When its gates are closed, the headgate dam (dam 2) also acts as a barrier to upstream and downstream fish passage, including passage for endangered steelhead, endangered spring Chinook salmon, and threatened bull

SECOND SUPPLEMENTAL COMPLAINT - 15

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

trout.  When the gates are open, the headgate dam can still act as a partial barrier to migration depending on water volume through the dam and the configuration of the gates.

44.     More than 20 miles of habitat suitable for bull trout, and other species, is located in Icicle Creek and its tributaries above the headgate dam (dam 2).

45.     Dam 5 also blocks upstream and downstream fish passage, including passage for threatened bull trout.  The Hatchery's placement of stop logs in dam 5 when conducting broodstock trapping activities and at other times of the year blocks fish passage.

46.     The Hatchery's water intake is located approximately 1.5 miles upstream of the Hatchery.  The water intake structure consists of a diversion dam, fish ladder, wide bar trash rack, and another narrower trash rack located in a building.  Water is conveyed from this intake to the Hatchery, using gravity, through a buried 31-inch pipe system.

47.     This water enters a sand-settling basin and goes through two screening chambers before use at the Hatchery.

48.     To date, the USFWS has failed to install appropriate screens on its water intake.  The existing fish screening devices on the Hatchery's water intake

SECOND SUPPLEMENTAL COMPLAINT - 16

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

system are outdated, inefficient, and do not comply with current federal and state regulatory requirements.

Start of the Icicle Creek Restoration Project

49.    Beginning in 1998, Wild Fish Conservancy has worked with its members, as well as other individuals and organizations in the Leavenworth area, to restore upstream and downstream passage for fish in Icicle Creek, including passage for threatened and endangered species.

50.    After negotiating with community members, the Hatchery agreed to implement a plan to restore Icicle Creek's natural channel and provide for fish passage into the upper reaches of Icicle Creek.

51.    In January 2002, USFWS published a Final Environmental Impact Statement for the Icicle Creek Restoration Project ("ICRP FEIS").  In the ICRP FEIS, USFWS stated that its preferred alternative included removal of all structures in the natural channel, with the exception of the headgate dam (dam 2) and dam 5, both of which were to be modified to allow for fish passage.

52.    The ICRP FEIS expressly avoids a detailed analysis of the Hatchery's water intake structure, effects of water withdrawals from that structure, or general hatchery operations.  Instead, the ICRP FEIS focuses on the effects related to the

SECOND SUPPLEMENTAL COMPLAINT - 17

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

construction and mitigation activities related to the restoration of fish passage in the natural channel of Icicle Creek.

53.    On March 12, 2002, USFWS issued a biological opinion addressing the Icicle Creek Restoration Project ("2002 USFWS Restoration BiOp") and concluded that the restoration project was not likely to jeopardize the continued existence of bull trout in the impacted segment of Icicle Creek.  The terms and conditions of the accompanying incidental take statement addressed demolition and construction activities in the Icicle Creek channel and not ongoing hatchery operations.

54.    On April 3, 2002, NMFS issued a biological opinion addressing the Icicle Creek Restoration Project ("2002 NMFS Restoration BiOp"), and concluded that the restoration project was not likely to jeopardize the continued existence of steelhead trout and spring Chinook salmon in the impacted portion of Icicle Creek. The 2002 NMFS Restoration BiOp, and the terms and conditions for the accompanying incidental take statement for the restoration project addressed demolition and construction activities in the Icicle Creek channel and not ongoing hatchery operations.

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

Fragmentation of the restoration project

55.     After issuance of the ICRP FEIS and the record of decision for the restoration project, the Hatchery announced that it did not have adequate funding to implement the Icicle Creek Restoration Project as proposed, planned, and analyzed.

56.     Frustrated by this turn of events, Wild Fish Conservancy members and other members of the Leavenworth community undertook to remove several of the long-abandoned and broken weirs, dams, and other structures littering the natural channel of Icicle Creek, including the expenditure of over $200,000 of private funds.  These efforts left only the headgate dam (dam 2) and dam 5 in the section of natural channel of Icicle Creek adjacent to the Hatchery.  Wild Fish Conservancy provided technical assistance in this effort.

57.     Since that time, the Hatchery has failed to remove, modify, or operate the two remaining barriers to fish passage in this section of the natural channel of Icicle Creek (the headgate dam (dam 2) and dam 5) to allow for fish passage.  The Hatchery has operated its structures to the detriment of fish and habitat values in Icicle Creek.

58.     As a result, at least in part, of the commencement of this action in June 2005, the Hatchery is now developing plans for further restoration of Icicle

SECOND SUPPLEMENTAL COMPLAINT - 19

SMITH & LOWNEY, P.L.L.C.
2317 EAST JOHN STREET
SEATTLE, WA 98112
(206) 860-2883

Creek and for modification of Hatchery facilities, including the headgate dam (dam 2), dam 5, the upstream water diversion structure and its screening, and facilities associated with the Hatchery's water supply system.

59.    In or about the spring of 2003, USFWS obtained new data from radio-tagged bull trout demonstrating that bull trout were moving back and forth between the lower Wenatchee River and the main spillway at the Hatchery throughout the year.  Based on this new data, according to statements of a USFWS representative at a June 2003 inter-agency meeting, it appears that in addition to upstream spawners and downstream juveniles, resident fish in the Wenatchee and Icicle systems need to be able to pass above the Hatchery facilities at all times of year. This radio telemetry data, as well as other information about the impacts of the Hatchery on the Icicle Creek ecosystem, was neither known nor taken into account in the ICRP FEIS or the 2002 USFWS Restoration BiOp.

60.    The Hatchery has not supplemented the ICRP FEIS, reinitiated consultation with USFWS, or reinitiated consultation with NMFS in light of these changes, delays and new information.

SECOND SUPPLEMENTAL COMPLAINT - 20

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

<u>The first bull trout biological opinion</u>

61.    When Wild Fish Conservancy initially filed this action on June 16, 2005, the Hatchery had failed to complete, or even initiate, Section 7 consultation on the effects of its structures and operations on threatened bull trout.

62.    In response to Wild Fish Conservancy's claims, at least in part, the Hatchery finally undertook consultation with USFWS on these effects during the course of this lawsuit.

63.    In exchange for Wild Fish Conservancy's agreement to withhold filing a motion for summary judgment on its claims concerning the Hatchery's failure to consult on impacts to bull trout, Defendants promised to complete the ESA Section 7 consultation on bull trout by September 1, 2006.

64.    The Hatchery issued its biological assessment for operation and maintenance of the Hatchery with respect to impacts on bull trout on July 10, 2006.

65.    On August 31, 2006, USFWS issued its first biological opinion for the operation and maintenance of the Hatchery "through 2011" ("2006 USFWS BiOp").

66.    The 2006 USFWS BiOp and the Hatchery's biological assessment set forth an operational plan for the Hatchery for the period of May 2006 through December 2011.  Among other things, this five-year operational plan describes

SECOND SUPPLEMENTAL COMPLAINT - 21

how the Hatchery will collect and release the fish it raises, operate its water supply system, and operate the structures it controls in Icicle Creek, including the headgate dam (dam 2) and dam 5.

67.    Despite the requirements of NEPA, the Hatchery has prepared no EA, no FONSI, no EIS, and no alternatives analysis for this five-year operational plan.

68.    The 2006 USFWS BiOp concludes that the five-year operational plan "is not likely to jeopardize the continued existence of the Columbia River distinct population segment of the bull trout." 2006 USFWS BiOp at 65.  However, this conclusion is reached without adequate consideration of cumulative effects and despite information presented in the 2006 USFWS BiOp that demonstrates both the importance of the Icicle Creek bull trout population to the distinct population segment and the seriousness of the effects of the five-year operational plan, particularly its regime for operation of the passage blocking structures.  For instance, the 2006 USFWS BiOp acknowledges that spawning migration is "the most critical movement necessary for survival of bull trout populations," and that the peak spawning migration time is from late May to early September "with a distinct peak in the migration about one month after peak runoff" (approximately mid-June).  Id at 45 and 46.  It continues, "[d]uring this period, spawning migration past [the Hatchery] is precluded by current operations at dams 2 and 5"

SECOND SUPPLEMENTAL COMPLAINT - 22

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

(associated with Chinook salmon broodstock collection).  Id.  "By mid- to late-July" (after dams 2 and 5 are open) "as river flows drop, it appears that the boulder area at rm 5.7 and [another diversion just upstream] are impassable because insufficient flow remains in the river to surmount them."  Id.  Furthermore, the biological opinion notes that "the proposed action is likely to preclude demographic and genetic contributions by migratory bull trout to the small known resident population in Icicle Creek."  Id at 51.  The 2006 USFWS Bi-Op further notes that restoration of the migratory bull trout life history to Icicle Creek (which can only result from the removal of the passage barriers and impediments associated with the Hatchery) would provide a significant benefit to the entire Wenatchee River bull trout core area by increasing the connectivity among bull trout populations within this core area.  It notes that the Icicle Creek is the largest tributary of the Wenatchee River and only one of the other six bull trout tributary populations in the core area (the Chiwawa River population) has a relatively large spawning population.  Consequently, the passage blockage at Icicle Creek directly threatens the recovery of bull trout in this core area.

69.    The 2006 USFWS BiOp includes an incidental take statement.  The incidental take statement is deficient for reasons including its failure to quantify the number of bull trout of which take is authorized, except for the estimated take from

SECOND SUPPLEMENTAL COMPLAINT - 23

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

direct handling of individual bull trout, including by entrainment in the hatchery

intake and conveyance to the sand settling basin, and to the activities associated

with the surplusing of excess hatchery spring Chinook salmon.  The total of bull

trout allowed to be taken is 21.  The incidental take statement does not quantify the

take from the numerous activities that impair the essential behavior of migratory

bull trout, such as the Hatchery's restriction of fish passage, reductions in instream

flow, degradation of water quality, and flow manipulation that continues to

degrade habitat in the historical channel, even though the 2006 USFWS BiOp

describes in detail the effects of these and other activities.

70.    This incidental take statement includes reasonable and prudent

measures and mandatory terms and conditions.  The terms and conditions are

inadequate to implement the reasonable and prudent measures.  For instance, term

and condition 16, intended to implement reasonable and prudent measure 4 –

"minimize the impacts of incidental take from operations of structures 2 and 5"

(dams 2 and 5) – requires the Hatchery only to convene a group of agencies to

begin development of an adaptive management strategy which is to lead to the

development of "a comprehensive bull trout passage plan for the Icicle Creek

basin." Id at 70.  This is inadequate and inappropriate given that the Hatchery's

SECOND SUPPLEMENTAL COMPLAINT - 24

five-year operational plan provides for the unconditional closure of dam 5,

blocking fish passage, from May 15 to July 7.

### The second bull trout biological opinion

71.    In late 2007, in response to Wild Fish Conservancy's motion for

summary judgment, Defendants moved for a voluntary remand of the 2006

USFWS BiOp.  The Court granted Defendants' motion.  On February 15, 2008,

Defendants issued a revised biological opinion, the Biological Opinion for the

Operation and Maintenance of the Leavenworth National Fish Hatchery through

2001 ("2008 USFWS BiOp").

72.    The action described and the analysis provided by the 2008 USFWS

BiOp is substantially the same as the description and analysis provided by the 2006

USFWS BiOp.

73.    Despite the requirements of NEPA, the Hatchery has prepared no EA,

no FONSI, no EIS, and no alternatives analysis for this five-year operational plan.

74.    The 2008 USFWS BiOp concludes that the five-year operational plan

"is not likely to jeopardize the continued existence of the coterminous U.S.

population of the bull trout because the intended survival and recovery functions of

the Columbia River interim recovery unit are likely to be maintained."  2008

USFWS BiOp at 88.  However, this conclusion is reached without adequate

SECOND SUPPLEMENTAL COMPLAINT - 25

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

consideration of cumulative effects and despite information presented in the 2008 USFWS BiOp that demonstrates both the importance of the Icicle Creek bull trout population to the distinct population segment and the seriousness of the effects of the five-year operational plan, particularly its regime for operation of the passage blocking structures.  This conclusion is contrary to fact and law.

75.    The 2008 USFWS BiOp includes an incidental take statement.  The incidental take statement is deficient.  The total amount of allowable take of bull trout taken is 22, only one more than the 2006 USFWS BiOp, which designated no take to impaired fish passage.  This incidental take statement reduces the "take" from operation of the inadequate water supply structure from 20 fish in the 2006 USFWS BiOp to only 2 fish in the 2008 USFWS BiOp, based on the fact that one dead bull trout per year was observed in 2001-2004 and increased monitoring by USFWS.  Two fish per year is an underestimate as it is likely that many more fish have been harmed than the one per year observed under an inadequate monitoring plan.

76.    The 2008 USFWS BiOp assigns "up to 20" threatened bull trout harmed due to impaired fish passage.  No basis for this number is given.  Instead, it appears that the USFWS merely reassigned the allowable take to different categories to keep the total number of fish taken more or less the same (21 in the

SECOND SUPPLEMENTAL COMPLAINT - 26

2006 USFWS BiOp versus 22 in the 2008 USFWS BiOp) to use the same jeopardy

analysis found in the 2006 BiOp in the 2008 BiOp, with a finding of "no

jeopardy." In fact, many more than 20 fish may be harmed due to impaired fish

passage, given the pristine nature of the habitat in Icicle Creek above the Hatchery.

77.    This incidental take statement includes reasonable and prudent

measures and mandatory terms and conditions. The terms and conditions are

inadequate to implement the reasonable and prudent measures. For instance, term

and condition 16, intended to implement reasonable and prudent measure 4 –

"minimize the impacts of incidental take from operations of structures 2 and 5"

(dams 2 and 5) – requires the Hatchery only to "continue the adaptive management

process" which is to lead to the development of "a comprehensive bull trout

passage plan for the Icicle Creek basin." Id at 95. This is inadequate and

inappropriate given that the Hatchery's five-year operational plan provides for the

unconditional closure of dam 5, blocking fish passage, from May 15 to July 7.

78.    The 2008 USFWS BiOp states that "the Service concludes that

hatchery effluent release into Icicle Creek is unlikely to cause adverse effects to the

bull trout." Id at 81. This is unlikely to be the case given the fact that Icicle Creek

below the Hatchery violates state water quality criteria for dissolved oxygen and

pH, and the cause of these violations is excess phosphorus in the effluent

SECOND SUPPLEMENTAL COMPLAINT - 27

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

discharged from the Hatchery.  The water quality criteria are in place to protect aquatic life, including bull trout.  This conclusion was reached because the Hatchery allegedly changed feed and the BiOp says lower phosphorus concentrations in the effluent "may" be due to that change in feed.  Id at 80-81.  However, there are no assurances cited in the BiOp that the Hatchery will continue with the practices , and more importantly, there is no analysis of in-stream conditions to determine if the recent practices cited in the BiOp, if continued will actually result in improvements to Icicle Creek through attainment of the appropriate water quality criteria.   A more reasonable conclusion is that the Hatchery's effluent discharge will continue to impair Icicle Creek and harm bull trout.

<u>Continued take</u>

79.    Current Hatchery operations are taking bull trout in the natural channel of Icicle Creek.  Wild Fish Conservancy has documented these fish in the natural channel and their unsuccessful attempts to migrate past the Hatchery's barriers.

80.    Furthermore, the Hatchery has not ensured that bull trout are handled carefully, and has not modified the intake screening or other features of its water

SECOND SUPPLEMENTAL COMPLAINT - 28

supply system to prevent harm to fish.  These actions result in take of listed species.

81.    Wild Fish Conservancy has made the Hatchery aware of all of the proble81 with Hatchery operations and impacts on threatened bull trout.

82.    The incidental take statement in the 2008 USFWS BiOp does not consider or address harm to listed fish eggs isolated in the historic channel through the Hatchery's continued blocking of fish passage and dewatering of the natural channel.

83.    These listed fish are harmed, among other reasons, because they are prevented from reaching better habitat upstream.

84.    Likewise, the Hatchery's operation of the headgate dam (dam 2) and dam 5 have excluded fish upstream and downstream of the natural channel from entering the natural channel.  For example, by restricting movements of listed fish, the Hatchery has harmed juvenile and adult life stages of the listed fish throughout Icicle Creek by disrupting pre-spawning behavior, interfering with the ability of spawners to find one another, and by restricting the ability of rearing juveniles to seek optimal habitats within the segment of Icicle Creek that spans the area immediately upstream and downstream of the historical channel.  These actions

SECOND SUPPLEMENTAL COMPLAINT - 29

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

impair the chances of listed fish to successfully spawn.  Hatchery activities have

other deleterious effects on listed fish as well.

CLAIMS FOR RELIEF

First Claim for Relief (ESA): 2008 USFWS BiOp inadequate

85.    Wild Fish Conservancy realleges and incorporates by reference each

and every allegation set forth in the paragraphs above.

86.    By failing to find that the Hatchery's five-year operational plan is

likely to jeopardize the continued existence of the threatened bull trout and the

Columbia River distinct population segment of threatened bull trout, and by failing

to satisfy legal requirements for its consultation obligations as the expert agency in

issuing the 2008 USFWS BiOp, USFWS and other Defendants have acted

arbitrarily and capriciously, abused their discretion, and acted otherwise not in

accordance with law.

Second Claim for Relief (ESA): Hatchery fails to insure no jeopardy

87.    Wild Fish Conservancy realleges and incorporates by reference each

and every allegation set forth in the paragraphs above.

88.    The Hatchery's operations, activities and structures are likely to

jeopardize the continued existence of the threatened bull trout and the Columbia

SECOND SUPPLEMENTAL COMPLAINT - 30

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

River distinct population segment of threatened bull trout.  Defendants are thus violating Section 7(a)(2) of the ESA.

### Third Claim for Relief (ESA): Take of threatened bull trout

88.    Wild Fish Conservancy realleges and incorporates by reference each and every allegation set forth in the paragraphs above.

89.    The Hatchery's operations, activities, and structure, including but not limited to blockage of passage in Icicle Creek and the entrainment of fish in the water supply system, result in take of threatened bull trout in violation of Section 9 of the ESA.  Defendants are therefore in violation of the ESA.

### Fourth Claim for Relief (NEPA): Failure to prepare an EIS on operational plan

90.    Wild Fish Conservancy realleges and incorporates by reference each and every allegation set forth in the paragraphs above.

91.    The five-year operational plan adopted by the Hatchery and related activities as described in the 2008 USFWS BiOp constitute a major federal action that significantly affects the quality of the environment.  Thus, preparation of an EIS is required under NEPA.

92.    Defendants have violated NEPA by failing to prepare either an EA or an EIS for the five-year operational plan and related activities, or to issue a FONSI.

### Fifth Claim for Relief (NEPA): Failure to prepare alternatives analysis

SECOND SUPPLEMENTAL COMPLAINT - 31

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

93.     Wild Fish Conservancy realleges and incorporates by reference each and every allegation set forth in the paragraphs above.

94.     Defendants have violated NEPA by failing to prepare an alternatives analysis for the Hatchery's five-year operational plan and related activities.

PRAYER FOR RELIEF

WHEREFORE, Wild Fish Conservancy respectfully requests that the Court:

A.     Declare that Defendants are in violation of Section 7 of the ESA because the 2008 USFWS BiOp is arbitrary and capricious or otherwise unlawful;

B.     Declare that Defendants are in violation of Section 7 of the ESA because they have failed to insure that their actions do not jeopardize the continued existence of the Columbia River distinct population segment of the threatened bull trout;

C.     Declare that Defendants are in violation of Section 9 of the ESA by taking threatened bull trout;

D.     Declare that Defendants are in violation of NEPA by failing to conduct environmental analysis or analyze alternatives for their five-year Hatchery operational plan and related actions and by improperly segmenting their activities in their environmental analyses;

SECOND SUPPLEMENTAL COMPLAINT - 32

E.      Order Defendants to immediately comply with the requirements of the ESA and NEPA;

F.      Enjoin the Hatchery from conducting further operations until compliance with the ESA and NEPA is achieved;

G.      Grant such preliminary or permanent injunctive relief as Wild Fish Conservancy may from time to time request during the pendency and resolution of this case to ensure that Defendants do not irreparably injure listed species;

H.      Award Wild Fish Conservancy its reasonable litigation expenses, including attorney fees, expert witness fees, court costs, and other expenses necessary for the preparation and litigation of this case under the ESA and the Equal Access to Justice Act, 28 U.S.C. § 2412 et seq.; and

I.      Grant such additional relief as the Court deems just and proper.

SECOND SUPPLEMENTAL COMPLAINT - 33

Smith & Lowney, P.L.L.C.
2317 East John Street
Seattle, WA 98112
(206) 860-2883

Respectfully submitted,

Dated:  May__, 2006

 s/ Richard A. Smith
WSBA # 21788
Brian A. Knutsen
WSBA # 38806
Attorney for Plaintiff
Smith & Lowney, PLLC
2317 E. John St.
Seattle, WA  98112
Telephone: (206) 860-2883
Fax: (206) 860-4187
E-mail: rasmithwa@igc.org
            briank@igc.org

SECOND SUPPLEMENTAL COMPLAINT - 34