UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WASHINGTON

| | | |
|---|---|---|
| WILD FISH CONSERVANCY, | ) | NO.   CV-05-0181-LRS |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER GRANTING DEFENDANTS'** |
| -vs- | ) | **MOTION FOR SUMMARY JUDGMENT** |
| | ) | **AND DENYING PLAINTIFF'S MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| DIRK KEMPTHORNE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

A hearing on the above matter was held April 9, 2009 in Yakima, Washington.  Brian Alan Knutsen participated on behalf of the Plaintiff Wild Fish Conservancy [WFC or Plaintiff]; John Brett Grosko participated on behalf of the Defendants U.S. Fish and Wildlife Service [FWS], Julie Collins, Dirk Kempthorne, and Dale Hall [collectively Federal Defendants].  The Court heard oral arguments on the Plaintiff's motion for summary judgment (Ct. Rec. 69) and Defendants' cross-motion for summary judgment (Ct. Rec. 130).  Also pending are Plaintiff's Motion to Strike And Alternative Motion to File Sur-Reply (Ct. Rec. 138); and Defendants' Motion to Strike (Ct. Rec. 143).

Plaintiff moves for summary judgment on all counts of their amended complaint on liability.  Defendants oppose Plaintiff's motion and

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 1

1  instead, request the court to grant summary judgment to the Defendants
2  on all counts.

3  **I.    INTRODUCTION**

4      In this case, the Plaintiff WFC challenges the operation of the
5  Leavenworth National Fish Hatchery ("Hatchery" or "LNFH"), located on
6  Icicle Creek.  WFC brings its action based on the Endangered Species Act,
7  16 U.S.C. §§ 1531-1544 (2000 & Supp. V) ("ESA" or "Act"). Specifically,
8  WFC complains that the U.S. Fish and Wildlife Service ("FWS") improperly
9  determined that the Hatchery's newly adopted operation and maintenance
10 plan for the years 2006 to 2011 ("O&M Plan") would not jeopardize the
11 threatened bull trout. WFC asserts that the O&M Plan blocks spawning
12 migration of bull trout, preventing access to over 20 miles of premium
13 bull trout habitat in Icicle Creek.  Biological Op. For the Operation and
14 Maint. Of Leavenworth Nat'l Fish Hatchery through 2011, pp. 67-69 (Feb.
15 15, 2008) ("2008 BiOp"). The O&M Plan is expected to cause the Icicle
16 Creek bull trout population to decline--a population that is arguably
17 critical to the bull trout Upper Columbia Recovery Unit.   WFC also
18 contends the O&M Plan required at least an environmental assessment
19 ("EA") under the National Environmental Policy Act, 42 U.S.C. § 4321 et
20 seq. ("NEPA").

21 **II.   FACTUAL BACKGROUND**

22     **A. Bull Trout**

23     Bull trout (Salvenlinus confluentus)has been listed as a "threatened
24 species" under the ESA by FWS since 1998.  63 Fed. Reg. 31,647;
25 Determination of Threatened Status for the Jarbidge River Population
26 Segment of Bull Trout, 64 Fed. Reg. 17,110 (Apr. 8, 1999); BiOp, p. 16

(ARC 013026). Bull trout are native to the Pacific northwest and Canada. They live in waters from the Klamath River Basin of south-central Oregon, to the Jarbidge River in Nevada, north to various coastal rivers of Washington to the Puget Sound and east throughout major rivers within the Columbia River Basin. Id. Bull trout can be either resident or migratory. Both forms may be found together, and either form may produce offspring exhibiting either resident or migratory behavior. They also can breed together. Bull trout typically spawn from August to November during periods of decreasing water temperatures. However, migratory bull trout frequently begin spawning migrations as early as April. *See* Determination of Threatened Status for the Klamath River and Columbia River Distinct Population Segments of Bull Trout, 63 Fed. Reg. 31,647, 31,648 (June 10, 1998).

While the precise number of bull trout in different reaches of Icicle Creek is not well known, in 2007 124 permanent, residential bull trout were observed in Icicle Creek. ARC 13053. In addition, migratory bull trout also reside there. ARC 13053. In 2002, 2004, 2006, and 2007, non-comprehensive surveys located nine to ten migratory bull trout, all over nineteen inches in length, above the Hatchery in Icicle Creek. Id.

Bull trout are iteroparous, meaning that they spawn more than once in a lifetime. Id. Because of this, bull trout require passage up and down streams throughout their life cycle for spawning and for foraging. Id. Spawning migration is the most critical movement necessary for the survival of bull trout populations. Id. at 46 (ARC 013056).

The Columbia River Interim Recovery Unit is one of five segments of the coterminous United States bull trout population, and is considered

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 3

1  essential to the survival and recovery of the species. Id. at 17 (ARC
2  013027). Bull trout within this recovery unit occupy only about 45% of
3  their estimated historic range and, where status is known, the remaining
4  subpopulations are declining. Id. at 19 (ARC 013029). The Wenatchee Core
5  Area is part of this recovery unit, and comprises seven local populations
6  of bull trout. Id. at 30 (ARC 013040). Icicle Creek is the smallest of
7  these local populations, and considered the most threatened. Id. at 51.
8  The species' decline is due to habitat degradation and fragmentation,
9  poor water quality, and the introduction of non-native species. 63 Fed.
10 Reg. 31,647. Although the FWS has established critical habitat for the
11 bull trout, it does not include Icicle Creek.

12    **B. The Hatchery**

13      The Leavenworth National Fish Hatchery, authorized by the Grand
14 Coulee Fish Maintenance Project and reauthorized by the Mitchell Act of
15 1938, is one of three mid-Columbia stations constructed by the U.S.
16 Bureau of Reclamation ("BOR") as fish mitigation facilities for the Grand
17 Coulee Dam, Columbia Basin Project. ARC 013017. Construction began in
18 1939. The Hatchery is located three miles south of Leavenworth,
19 Washington, near the mouth of Icicle Canyon. Id. Icicle Creek is a
20 tributary of the Wenatchee River, located near Leavenworth, Washington,
21 which itself feeds into the Columbia River. Id. at 13047.

22      The operation and management of the Hatchery can be broadly
23 described as comprising three components: (1) the collection of adult
24 fish (brood); (2) the release of juvenile fish; and (3) the operation of
25 the water supply system. Id. 13017. Fish collection occurs as adult
26 spring Chinook salmon return to the Hatchery from May into July. Id. This

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 4

is known as the "brood collection period." Id. The Hatchery's fish ladder is operated at this time to provide returning fish access to the Hatchery's adult holding pond. Id. Adult salmon in excess of brood needs (1,000 adult salmon) support a tribal and sport fishery in Icicle Creek. Id. Any non-target fish (e.g., steelhead, bull trout) encountered in the adult holding pond during sorting are netted and immediately returned back to Icicle Creek under the supervision of Hatchery personnel. Id.

The Hatchery's purposes are to release juvenile Chinook salmon, targeting a mid-April release of 1.625 million spring smolts each year into Icicle Creek. Id. at 13022. The Hatchery also supports the Yakama Nation's Coho Salmon Reintroduction Project by providing rearing space for approximately 750,000 Coho salmon presmolts. Id.; see also Federal Defendants' Statement of Material Facts ¶¶ 12-17 (regarding tribal fisheries).

Since its construction in 1939 and completion in 1940, until 2001, the Hatchery blocked adult salmon from accessing areas upstream of the Hatchery throughout the year. ARC 13066. This has kept spring Chinook salmon from accessing upstream areas, assuring the collection of an adequate hatchery brood and reducing the risk of disease inherent in having this species in the Hatchery water supply area. Id. Blockage is accomplished by installing racks and dam boards at the downstream terminus of the historic channel at structure 5 ("Dam 5"). When racks are installed at Dam 5, the radial gates at the upstream terminus of the historic channel at structure 2 ("Dam 2") have historically been closed to minimize flow through the historic channel.

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 5

Plaintiff reports the most significant passage barriers remaining in the Wenatchee Core Area are the Hatchery dams on Icicle Creek. 2008 BiOp, p. 32 (ARC 013042). There are four Hatchery structures that impede native fish migrations. Id. at 54 (ARC 013064). The furthest upstream of these structures, the intake dam and system, is improperly screened, entrains fish, and does not comply with regulatory criteria. Id. at 33, 55, 63-64 (ARC 013043, 013065, 013073-74). Another structure is a spillway from the Hatchery's artificial canal into Icicle Creek that prevents native fish from swimming upstream into the artificial canal. Id. at 54 (ARC 013064). The remaining two structures are Dams 2 and 5 located in the natural channel of Icicle Creek. Id. at 54-55 (ARC 013064-65).

For years, the Hatchery has been working on long-term fish passage solutions and habitat improvements through what has been known as the "Icicle Creek Restoration Project." Id. at 13019. During the time the series of measures has been implemented, the Hatchery proposed a number of changes to the operations of the structures in the historical portion of Icicle Creek to improve flow conditions and increase passage opportunities for bull trout, compared to past operations. Id. 13019-13020. These operational changes, and the continued operation of the Hatchery from 2006 to 2011, make up the O&M Plan.

The first measure taken as part of the O&M Plan was - beginning in 2006 - was the removal of all racks and dam boards at Dam 5 whenever Chinook broodstock activities are not occurring. Id. at 13020. Hatchery broodstock activities generally occur from mid-May through the first week of July.  Second, at least one, and often both, of the two radial gates

at Dam 2 are left open with a minimum 4-foot opening to allow migratory bull trout to pass. Id.   Third, the FWS has begun using an adaptive management approach ("AMA") to reduce, whenever possible, the seven week period during which bull trout passage is blocked, from May 15 to July 7 (during the broodstock collection period). Id. As part of this effort, the Hatchery considers annual run timing of spring Chinook salmon at Columbia River dams (e.g., Priest Rapids, Rock Island) to adjust the May 15 date. Id. For example, a later run-timing may allow for a slightly later installation. Id. Additionally, attempts are being made with respect

to the end date of the broodstock collection period (July 7) to minimize the time period of blocked fish passage. Id. This could occur, e.g., when Chinook salmon returns are not excessive and brood and harvest needs have been satisfied. Id.  Another component of this approach requires that at non-broodstock collection times, the FWS operate the radial gates at Dam 2 differently, with one gate open and the other closed. Id.

During the May 15 to July 7 salmon broodstock collection period, the Hatchery uses two methods to improve interim passage opportunities by capturing and transporting bull trout upstream of the Hatchery. Id. First, all adult bull trout collected in the spring Chinook salmon holding pond are released upstream of the Hatchery. Id. Second, the Hatchery has begun to trap bull trout at structure 5, with any adult bull trout captured at the trap released upstream of the Hatchery. Id. These two methods may facilitate relocation of bull trout to upstream areas which could, in turn, benefit the Icicle Creek bull trout population. Id.

The Hatchery is also using AMA to investigate other alternatives to achieve passage, such as opening the structures for a short time during the broodstock collection window, or capturing and transporting bull trout upstream. Id. Such decisions would be based on flow conditions, bull trout return dates and rates, Chinook salmon return dates and rates, tribal fishery needs, disease risks, and habitat conditions. Id.

Defendants report that these efforts have had several effects. Namely, in September 2002, three or four migratory-size bull trout and a fifth in September 2004 were seen at approximately river mile ("rm") 6, above all diversion dams and the Snow Creek boulder area. Id. at 13053. In the summer of 2006, one migratory size bull trout was observed at approximately rm 12. Id. In August and September 2007, at least four migratory-size bull trout ranging from 19" to 24" were observed at approximately rm 15 as they attempted to jump the falls at that location. Id. In early October 2007, one migratory-size bull trout was observed in lower French Creek, a tributary in upper Icicle Creek, at approximately rm 20. Id. In addition, it is also possible that some bull trout have passed undetected. Id. at 13041. The presence of these migratory-size bull trout in Icicle Creek above all diversion dams and boulder areas, as observed in 2007 during the spawning season, suggests it is likely that as a result of the O&M Plan, at least occasionally conditions permit migratory bull trout to access what is considered to be good spawning habitat in upper Icicle Creek. Id.

Defendants suggest these aforementioned opportunities may have resulted in upstream spawning.[1] Even periodic spawning connectivity by a small number of migratory individuals could have significant and beneficial genetic implications for the Icicle Creek population. Id. at 13058. These improvements are likely to substantially enhance the viability of the Icicle Creek local population by increasing reproduction (due to the presence of large migratory individuals that have higher fecundity than resident bull trout, and other advantages), facilitating the re-establishment of multiple life history forms in the Icicle Creek local population, and minimizing the potentially deleterious genetic effects of inbreeding. Id. at 13061. FWS concluded the changes implemented may increase the contribution of the Icicle Creek population to the survival and recovery needs of the bull trout at the core area, recovery unit, and range-wide scales. Id. at 13063.

Given the bull trout's persistence in Icicle Creek for the last sixty-seven years in the face of passage barriers and other limiting factors in Icicle Creek, it is likely that in the short-term the risk of extirpation for the Icicle Creek population is moderately low. Id. at

---

[1]FWS estimates that Icicle Creek above the Hatchery is capable of supporting 2,000 spawning pairs of migratory bull trout—only 5% of which are necessary to meet the minimum recovery criteria for this local population. Id. at 40 (ARC 013050). FWS estimates that up to 200 migratory bull trout would be present in upper Icicle Creek each year if the Hatchery provided unimpeded passage for several bull trout generations. Id. at 50 (ARC 013060).

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 9

13060. Defendants conclude that while in the long-term that risk is higher, it is not as high as it was before formal O&M Plan changes were instituted. Id.

/ / /

/ / /

**C. The 2008 Biological Opinion**

In February 2008 the FWS completed the 113-page "Biological Opinion for the Operation and Maintenance of the Leavenworth National Fish Hatchery through 2011" ("2008 BiOp") concerning the O&M Plan. Id. at 13010-13123. The 2008 BiOp begins by describing the proposed action as encompassing all aspects of Hatchery operation and management from May 2006 through December 2011. Id. at 13124. The 2008 BiOp then explained the analytical framework utilized for the FWS's jeopardy determination, and reviewed the bull trout's status and the Icicle Creek population, the overall environmental baseline, and direct and cumulative effects of the action. ARC 13011-13012. The effects of the O&M Plan aggregated with the effects of "everything that has led to the bull trout's current status" along with, for non-Federal activities in the action area, actions likely to affect the bull trout in the future." ARC 13025.

The FWS used four conceptual components in its analysis: (1) the status of the species, which evaluates the bull trout's range-wide condition, including its survival and recovery needs; (2) the environmental baseline, which evaluates the condition of the bull trout in the action area, the factors responsible for that condition, and the role of the Hatchery in the bull trout's survival and recovery; (3) the effects of the O&M Plan, which determines the direct and indirect impacts

of the proposed Federal action and the effects of any interrelated or interdependent activities on the bull trout; and (4) cumulative effects, which evaluates the effects of future, non-Federal activities in the Hatchery on the bull trout. ARC at 13025.

While the unit assessed for the BiOp was the Icicle Creek population, the 2008 BiOp's environmental baseline focused on the Wenatchee River bull trout population. Id. at 13046. This population, which encompasses the Icicle Creek population, is considered a relative stronghold for the species. Id. at 13046.

The FWS ultimately concluded that a total of twenty-two migratory bull trout would be affected by the O&M Plan. Id. at 13101-13102. In particular, the FWS found one migratory bull trout would be killed, another harmed but not killed, and the spawning migrations of twenty bull trout affected under the O&M Plan. Id. at 13077-13078. Of these twenty, the FWS observed fifteen would likely be impeded from completing their upstream journey to spawning grounds. Id. at 13078. The other five would only be temporarily delayed and would be able to reproduce. Id. at 13078. The FWS considered whether, given the aggregate of all of these effects, implementation of the O&M Plan would likely cause an appreciable reduction in the likelihood of the survival and recovery of the bull trout in the wild. Id. at 13025; see also 15 C.F.R. § 402.02. It concluded it did not. Id. at 13010.

## III. RELEVANT STATUTES

### A. The Endangered Species Act

The ESA requires the Secretary of the Interior to promulgate regulations listing those species of animals that are "threatened" or

"endangered" under specified criteria. 16 U.S.C. § 1533. Pursuant to ESA Section 7(a)(2), 16 U.S.C. § 1536(a)(2), each federal agency must ensure that any action "authorized, funded, or carried out by such agency" is "not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of designated critical habitat. Agency regulations interpret § 7(a)(2) to prohibit any agency action "that reasonably would be expected, directly or indirectly, to reduce appreciably the likelihood of both the survival and recovery of a listed species in the wild." 50 C.F.R. § 402.02; *Reservation Ranch v. United States*, 39 Fed. Cl. 696, 705 (1997).

The ESA requires the action agency – here, the Hatchery – to consult with the FWS whenever a federal action "may affect" an endangered species or designated critical habitat. 50 C.F.R. § 402.14(a). Consultation may be formal or informal.  During a section 7 consultation, the consulting agency must "[e]valuate the effects of the action and cumulative effects on the listed species or critical habitat," and determine "whether the action, taken together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or

adverse modification of critical habitat." 50 C.F.R. § 402.14(g)(3), (4).

Formal consultation commences at the time of the action agency's written request for section 7(a)(2) consultation and concludes when the FWS issues a biological opinion, including a determination as to whether the proposed action is likely to jeopardize the continued existence of a listed species. 16 U.S.C. § 1536(b)(3); 50 C.F.R. §§ 402.02, 402.14.

If the FWS determines that the proposed action is not likely to jeopardize the species, but may result in the incidental "take" of members of the species, the FWS issues an incidental take statement ("ITS") with its biological opinion. 16 U.S.C. § 1536(b)(4). Take is defined as to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture or collect, or attempt to engage in any such conduct. 50 C.F.R. § 402.02. The ITS must specify: (1) the impact of the incidental taking upon the species; (2) reasonable and prudent measures necessary or appropriate to minimize that impact ("RPMs"); and (3) the terms and conditions with which the action agency must comply to implement such RPMs ("T&Cs"). Id. § 1536(b)(4)(C)(I)-(ii), (iv).

Any federal agency that deviates from any RPM or T&C must later be prepared to articulate its reasons for disagreeing with the biological opinion's conclusions. Interagency Cooperation - Endangered Species Act of 1973, as Amended, Final Rule, 51 Fed. Reg. 19,926, 19,956 (June 3, 1986). Thus, after consulting with the FWS, the action agency must determine whether it has taken all necessary steps to ensure it acts in compliance with all RPMs and T&Cs. *National Wildlife Fed'n v. Coleman*, 529 F.2d 359, 371 (5th Cir. 1976). Conversely, the ITS functions as a safe harbor immunizing an action agency from the take prohibition of the ESA, provided it occurred while the agency was in compliance with the biological opinion's RPMs. 16 U.S.C. § 1533; *see also Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1239 (9th Cir.2001).

**B. The National Environmental Policy Act**

NEPA, the other statute at issue in this case, requires analysis and public disclosure of significant environmental effects, but does not require agencies to select any particular decision. *Robertson v. Methow Valley Citizen's Council*, 490 U.S. 332, 350 (1989). The object of NEPA is to foster better decision-making and informed public participation for actions that affect both people and the natural environment.  See 42 U.S.C. § 4321; 40 C.F.R. § 1501.1(c).  NEPA also established the Council on Environmental Quality[2] ("CEQ"), which adopted regulations in 1978, governing federal agency compliance with NEPA. 40 C.F.R. §§ 1500-1517.

CEQ's regulations provide for two methods of determining whether a proposed major federal action requires preparation of an Environmental Impact Statement ("EIS"). First, the agency may conduct an EA. Id. §§ 1501.4, 1508.9. The EA "serves to . . . briefly provide sufficient evidence and analysis" to determine whether the action will have a significant effect on the environment, the threshold for preparation of an EIS. Id. § 1508.9. Second, CEQ's regulations direct agencies to identify classes of actions, referred to as categorical exclusions ("CEs"), that normally "do not individually or cumulatively have a significant effect on the human environment" and are, therefore, excluded from EA and EIS requirement. Id. § 1508.4; *see also Alaska Ctr. for the Env't v. U.S. Forest Serv*., 189 F.3d 851, 857 (9th Cir. 1999). In 1983, CEQ explained that the use of CEs avoided unnecessary documentation of minor environmental effects. 48 Fed. Reg. 34,265-66 (July 28, 1983).

---

[2]42 U.S.C. § 4342.

Courts do not apply NEPA to federal actions that merely maintain the status quo. *See Fund for Animals, Inc. v. Thomas*, 127 F.3d 80, 84 (D.C. Cir. 1997); *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 175 F. Supp.2d 755 (E.D. Pa. 2001). In addition, the routine maintenance of an ongoing, pre-NEPA project does not trigger NEPA's requirements. *See Upper Snake River of Trout Unlimited v. Hodel*, 921 F.2d 232, 234 (9th Cir.1990).

If an agency takes major federal action regarding a project, NEPA is triggered. *See Port of Astoria v. Hodel*, 595 F.2d 467, 479 (9th Cir. 1979). The determination of whether an agency action constitutes a major federal action "depend[s] heavily upon the unique factual circumstances of each case." *Westside Prop. Owners v. Schlesinger*, 597 F.2d 1214, 1224 (9th Cir. 1979). In this context, courts have looked at "whether the proposed agency action and its environmental effects were within the contemplation of the original project when adopted or approved." *Westlands Water Dist. v. U.S. Dep't of the Interior*, 850 F. Supp. 1388, 1415 (E.D. Cal. 1994).

**IV.   STANDARDS OF LAW**

   **A.   Summary Judgment Standard**

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.Page 56(c).   In ruling on a motion for summary judgment the evidence of the non-movant must be believed, and all

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 15

justifiable inferences must be drawn in the non-movant's favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513 (1986). However, when confronted with a motion for summary judgment, a party who bears the burden of proof on a particular issue may not rest on its pleading, but must affirmatively demonstrate, by specific factual allegations, that there is a genuine issue of material fact which requires trial. *Celotex Corpage v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553 (1986).

The party must do more than simply "show there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corpage*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356 (1986) (footnote omitted). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Id*., 475 U.S. at 587, 106 S.Ct. at 1356. This court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. at 2511. Summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

In the instant case, the underlying facts are documented in the administrative record submitted December 2005, February 2007, and April 2008, the latter referred herein as "ARC". The only issues that remain to be resolved are legal, and summary judgment is an appropriate method to decide this matter.

**B. APA Review**

The Court's review of an agency's actions is governed by the "arbitrary and capricious" standard of review of the APA. *Aluminum Co. of Am. v. Bonneville Power Admin.*, 175 F.3d 1156, 1160-61 (9th Cir. 1999). The Court's review under this standard is narrow, and the Court cannot substitute its judgment for that of the agency, particularly when "the challenged decision implicates substantial agency expertise." Id. at 1160-61 (citation omitted); *Arizona Cattle Growers' Ass'n v. U.S. Fish and Wildlife Serv.*, 273 F.3d 1229, 1236 (9th Cir.2001) (noting the "narrow scope of review"). Under the "arbitrary and capricious" standard, a reviewing court must consider only whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Id. at 1236.

The standard is "highly deferential, presuming the agency action to be valid and affirming the agency action if a reasonable basis exists for its decision." *Independent Acceptance Co. v. California*, 204 F.3d 1247, 1251 (9th Cir. 2000)(citations omitted).  The court may reverse only when the agency has relied on factors that Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *See Pacific Coast Fed'n of Fishermen's Ass'n v. NMFS*, 265 F.3d 1028, 1034 (9th Cir. 2001).

The challenger's burden to overcome this deferential standard of

review is a heavy one, because the agency's decisions and processes are entitled to a presumption of validity and regularity. *See Citizens to Preserve Overton Park*, 401 U.S. 402 (1971) (abrogated on other grounds by *Califano v. Sanders*, 430 U.S. 99 (1977)). *See also Akiak Native Community v. United States Postal Service*, 213 F.3d 1140, 1146 (9th Cir.2000)("[T]he agency's decision-making process is accorded a 'presumption of regularity.' We consider only whether the Postal Service's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

The Ninth Circuit recently clarified the APA's arbitrary and capricious standard of review that governs the review of environmental decision-making. On an appeal of a preliminary injunction under the National Forest Management Act, the Court stated:

> [I]n essence, Lands Council asks this court to act as a panel of scientists that instructs the Forest Service how to validate its hypotheses regarding wildlife viability, chooses among scientific studies in determining whether the Forest Service has complied with the underlying Forest plan, and orders the agency to explain every possible scientific uncertainty. As we will explain, this is not a proper role of a federal appellate court. But Lands Council's arguments illustrate how, in recent years, our environmental jurisprudence has, at times, shifted away from the appropriate standard of review and could be read to suggest that this court should play such a role.

*Lands Council v. McNair*, 537 F.3d 981, 988 (9th Cir. 2008) (en banc).

Review of biological opinions issued pursuant to the ESA is limited to ensuring "that the FWS's decisions are based on a consideration of relevant factors and . . . whether there has been a clear error of judgment." *Gifford Pinchot Task Force v. U.S. Fish and Wildlife Service*, 378 F.3d 1059, 1065 (9th Cir. 2004). The Court must also ensure the "FWS

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 18

1  [has] state[d] a rational connection between the facts found and the
2  decision made." Id. The FWS's interpretation of its own regulations,
3  moreover, is subject to deference. *United States v. McKittrick*, 142 F.3d
4  1170, 1173 (9th Cir. 1998).

5       Where an agency's particular technical expertise is involved, the
6  reviewing court is at its most deferential in reviewing an agency's
7  findings. *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 376-377
8  (1989) (*citing, inter alia, Kleppe v. Sierra Club*, 427 U.S. 390, 412
9  (1976)); *Baltimore Gas & Elec. v. NRDC*, 462 U.S. 87, 103 (1983). The
10 court is not required to weigh conflicting expert opinions or to consider
11 whether the agency employed the best scientific methods. *Friends of*
12 *Endangered Species, Inc. v. Jantzen*, 760 F.2d 976, 986 (9th Cir. 1985).
13 "When specialists express conflicting views, an agency must have
14 discretion to rely on the reasonable opinions of its own qualified
15 experts even if, as an original matter, a court might find contrary views
16 more persuasive." *Marsh*, 490 U.S. at 378, *citing Overton Park*, 401 U.S.
17 at 416. The fact that a plaintiff disputes the agency's findings and
18 conclusions "is not a sufficient basis for [the court] to conclude that
19 [the agency's] action was arbitrary or capricious. If it were, agencies
20 could only act upon achieving a degree of certainty that is ultimately
21 illusory." *Greenpeace Action v. Franklin*, 14 F.3d 1324,1336 (9th Cir.
22 1992).

23 **V.  ANALYSIS**

24       **A. The Parties**

25       Plaintiff Wild Fish Conservancy, earlier known as Washington Trout
26 in this litigation, is a non-profit, 501(c)(3) organization with its

principal place of business in Duvall, Washington. See Complaint for Declaratory and Injunctive Relief, Ct. Rec. 1. WFC is dedicated to the preservation and recovery of Washington's native fish species and the ecosystems upon which those species depend. WFC brings this action on behalf of itself and its approximately 2,400 members.

As a concerned environmental observer, WFC actively informs the public on matters affecting water quality, fish, and fish habitat in the State of Washington through publications, commentary to the press, and sponsorship of educational programs. WFC also conducts field research on wild-fish populations and has designed and implemented habitat restoration projects. WFC has lobbied, litigated, and publicly commented on federal and state actions that affect state waters. WFC routinely seeks to compel the FWS, an agency charged with protecting biologically imperiled species such as bull trout, to follow the laws designed to protect and recover those species.  WFC's staff and members derive scientific, recreational, health, conservation, spiritual, and aesthetic benefits from the preservation and protection of threatened and endangered species under the ESA. More specifically, WFC's staff and members spend time in Icicle Creek and member(s) reside near and regularly visit Icicle Creek.  Ct. Rec. 1.

Defendant Dirk Kempthorne[3] is the Secretary of the Interior and, as such, is the federal official ultimately responsible for ensuring that the FWS complies with the ESA and NEPA.  Defendant FWS is an executive

---

[3]Secretary of the Interior Gale Norton was named in the original complaint and was terminated from the action on December 21, 2006.

branch department within the Department of the Interior. FWS is responsible for administering the provisions of the Endangered Species Act with regard to threatened and endangered species, including the threatened bull trout that inhabit Icicle Creek. Defendant Dale Hall[4] is the Director of FWS. Defendant Julie Collins is the Manager of the Leavenworth National Fish Hatchery Complex and, as such, is responsible for the Hatchery's compliance with the ESA and NEPA. Ct. Rec. 1.

/ / /

### B. Plaintiff's Position and Defendants' Opposition Thereto

Plaintiff contends that FWS's finding of "no jeopardy" is arbitrary, capricious, an abuse of discretion and not in accordance with law because FWS: (1) fails to account for Hatchery effects beyond the 5-year duration of the O&M Plan; (2) relies on a comparison of historic Hatchery operations and the O&M Plan; (3) fails to draw a rational connection between the record and the finding of "no jeopardy;" (4) improperly relies on uncertain future mitigation measures; and (5) fails to consider the effects from all interrelated and interdependent activities. Ct. Rec. 116 at 13. Plaintiff also asserts that FWS should have completed an EIS or at least an EA because the O&M Plan was subject to NEPA. Finally, Plaintiff contends the ITS is invalid. The Court will discuss each of these six major contentions and Defendants' responses below.

### 1. O&M Plan's 5-Year Duration

---

[4]Matthew J. Hogan was named in the original complaint, who at the time, was the Acting Secretary of the FWS. Mr. Hogan was also terminated from this action on December 21, 2006.

Plaintiff asserts that FWS only considered the effects of the Hatchery operations from May 2006 through December 2011 in making its "no jeopardy" conclusion. E.g., 2008 BiOp, pp. 7, 91 (ARC 013017, 013101). Citing *Am. Rivers v. United States Army Corps of Eng'rs*, 271 F.Supp.2d 230, 254-55 (D.D.C. 2003), Plaintiff argues FWS's failure to consider the Hatchery's impact beyond this artificial 5-year duration of the O&M Plan is arbitrary, capricious and not in accordance with law.

Plaintiff acknowledges that the 2008 BiOp does explain that the effects of Hatchery operations on bull trout were evaluated only through 2011 because it is anticipated that the Hatchery will construct a new water intake system and develop a habitat restoration project by such time, which will require modifications to Hatchery operations. 2008 BiOp, 14-15 (ARC 013024-25). Plaintiff argues, citing *Connor v. Buford*, 848 F.2d 1441, 1454 (9th Cir. 1988), that regardless of any uncertainty as to future operations, FWS must use the best available information to evaluate the effects of the Hatchery beyond the supposed duration of the O&M Plan.

Defendants respond that an agency's decision to limit its analysis to a given time period is not only reasonable but also commonplace. This approach recognizes that practical considerations, such as the planned alteration of a project, may define the appropriate period of analysis. *National Wildlife Fed'n v. National Marine Fisheries Service*, Nos. 01-640-RE, 05-23-RE, 2005 WL 1278878, at *30 (D. Or., May 26, 2005) (discussing National Marine Fisheries Service biological opinions analyzing dam operations during 1 and 4 year periods); *Save our Springs Alliance v. Cooke*, No. 01-CA-855-SS, 2002 WL 31757473, at *8 (W.D. Tex.,

Nov. 12, 2002) (considering BiOp covering 5 year permit period).
Defendants urge that it is reasonable to do so explaining that some
biological opinions may consider effects of a one year permit, requiring
the review of the effects for the next year. Other projects may be of
longer duration.

Defendants explain that the BiOp's breadth and scope of analysis for
the Hatchery was broad enough to encompass all the impacts that are
likely to jeopardize the bull trout over the O&M Plan's five year period.
Additionally, the FWS also rationally chose five years as the time period
because on or before 2010, Hatchery operations are likely to be
significantly modified in a manner that will require reinitiation of
consultation. Id. Specifically, due to its age, advanced state of
deterioration, and currently ineffective fish exclusion screening,
several years ago the FWS and BOR identified replacement of the original
water supply system at the Hatchery as a top priority. ARC 13024-13025;
14850-14851. The plans for these changes are in their advanced stages.

Defendants further explain that in 2006, the BOR and the FWS
convened a Project Alternative and Solution Study to sequentially
evaluate the water intake project and a fish habitat restoration project
at the Hatchery. Id. A group of policy and technical representatives
from the FWS, BOR, other federal and state resource agencies, the Yakama
Nation, and the Plaintiff, were all invited to contribute staff to a
technical team. Id. Beginning in October 2006, the technical team
collaborated and developed a preferred alternative design for the new
water intake system, which was approved by the FWS and the BOR in
November 2007. ARC 13024-13025, 14850-14851. The BOR plans to expend

several millions of dollars for implementation of this alternative. Id. FWS estimates construction of a new water intake system is likely to be completed by 2010. Id. This alteration will result in major changes to the way the Hatchery is run, and materially alter the ability of bull trout to migrate upstream. ARC 13024-13025; 14850-14851. Because of these major changes, the FWS will re-initiate and complete consultation on construction of the new water intake system and Hatchery operations prior to completing this project. ARC 14850-14851.

Plaintiff counters that mitigation measures relied on for a finding of "no jeopardy" must be reasonably certain to occur, subject to deadlines, and must address the threats to the species in a way that satisfies the jeopardy standard. Ct. Rec. 116 at 22. Plaintiff argues that mitigation measures not reasonably certain to occur should be excluded from the jeopardy analysis. Neither the 2008 BiOp nor the Incidental Take Statement included with it provides enforceable or certain assurances that mitigation will ever occur. Plaintiff concludes the absence of "specific and binding plans" preclude FWS from assuming improved future conditions and there is no basis for FWS to assume that bull trout migration conditions will improve in the future, or to limit its analysis to five years.

**2. Comparison of Historic and Present Hatchery Operations**

Plaintiff states that in reaching its "no jeopardy" conclusion, FWS repeatedly states that the O&M Plan will have a positive effect on bull trout—that it "is likely to contribute to the survival of the bull trout." E.g., 2008 BiOp, 86, 90 (ARC 013096, 013100). The only way that FWS can reach this conclusion, Plaintiff surmises, is by allegedly

impermissibly comparing historic Hatchery operations to the O&M Plan, and thereby failing to consider all of the actual effects of the proposed action.

Defendants assert that Plaintiff is incorrect.  The 2008 BiOp takes a comprehensive look at the Hatchery, and considered its historic effect as part of the overall assessment of the current status of the Icicle Creek population.  Because of the Hatchery's presence for decades and location, any analysis of the Icicle Creek bull trout population would have to consider its historical effects. As part of this analysis, FWS therefore considered what improvements will result from the O&M Plan. Far from neglecting any aspect of the Hatchery's operation, the 2008 BiOp considered the relevant population trend, noted likely improvements in this trend, and concluded that even though it may remain slightly negative, the proposed action will not jeopardize the Icicle Creek bull trout population. ARC 13101. This conclusion is entirely consistent with the ESA. 50 C.F.R. § 402.02.

### 3. Rational Connection Between Record and Findings

Plaintiff states, citing *Pac. Coast Fed'n of Fishermen's Ass'ns, Inc. v. Nat'l Marine Fisheries Serv.*, 265 F.3d 1028, 1034 (9th Cir. 2001), that the 2008 BiOp should be set aside because it fails to draw a rational connection between the record and the finding of "no jeopardy." Ct. Rec. 116 at 20.  Plaintiff suggests that this Court overturn the agency decision where, as here, there is no rational connection between the facts found and the choice made. *Pyramid Lake Paiute Tribe of Indians v. United States Dep't of the Navy*, 898 F.2d 1410, 1414 (9th Cir. 1990).

ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT . . . - 25

1    Plaintiff argues that there are two central findings that FWS fails
2 to consider in reaching its "no jeopardy" conclusion: 1) the record
3 indicates that the long-term persistence of the Icicle Creek bull trout
4 population is critical to the Columbia River Interim Recovery Unit—the
5 appropriate population level for "jeopardy" analysis; and 2) maintenance
6 of the Icicle Creek population is dependant on restoring the migratory
7 life form of bull trout, and because the O&M Plan reduces and even
8 precludes this from happening, the Icicle Creek population will continue
9 to decline.

10    Plaintiff further asserts that FWS fails to explain how conditions
11 will be any different when the O&M Plan expires, and the 2008 BiOp
12 includes no requirement that the Hatchery improve passage opportunities
13 during or at the expiration of the O&M Plan. This alleged deficiency
14 amounts to a failure to draw any rational connection between the record
15 and its finding of "no jeopardy." This finding, Plaintiff concludes, is
16 therefore arbitrary, capricious, an abuse of discretion and not in
17 accordance with law.  Ct. Rec. 116 at 21.

18    Defendants counter that FWS made a rational connection between the
19 facts it found and the no jeopardy finding.  More specifically,
20 Defendants point out that FWS noted for most of the time since 1940 when
21 barriers have prevented migratory bull trout access to upper Icicle Creek
22 spawning areas, all reproduction depended on small, resident-only life
23 history form. ARC at 13041-13042.  FWS observed migration to upper Icicle
24 Creek by this resident-only local population will not be affected by the
25 Hatchery. Given the species' persistence in Icicle Creek for the last
26 sixty-seven years, in the face of passage barriers and other limiting

1  factors, such as irrigation diversions and non-native species, FWS found

2  it is likely that even if increased passage for migratory bull trout were

3  not allowed, in the short-term, extirpation risk is moderately low.

4  ARC 13060.

5      Defendants also note that FWS further explained "[t]he periodic

6  breeding of resident and migratory life forms of the bull trout in Icicle

7  Creek is likely to contribute to maintaining and improving the viability

8  of this local population and its contribution to the viability of the

9  core area and interim recovery unit populations of the bull trout." ARC

10 13094. The FWS stated:

> Assuming upstream habitat conditions remain stable and
> benign, no appreciable reductions and some minor
> beneficial effects are likely to occur to the resident
> population of the bull trout in Icicle Creek as a result
> of the proposed action, and no appreciable adverse
> changes in bull trout distribution and abundance are
> expected as a result of the proposed action at the core
> area and recovery unit scales.

ARC 13095.

16     In support of Defendants' rational connection argument, they further

17 explain that FWS concluded the improvements allowing for more passage

18 have brought about results.  Ct. Rec. 129 at 20-21.  FWS observed that

19 in 2001, 2006, 2007, and possibly in 2002 and 2004, large migratory bull

20 trout have been able to pass upstream of the Hatchery. ARC 13041, 13046.

21 The results from 2006 and 2007 in particular may well have resulted from

22 the modifications to operations the Hatchery implemented in 2006. ARC

23 13,041, 13046. FWS found observations of migratory bull trout in

24 mid-Icicle Creek in 2006 and 2007 supports a finding that at least twice

25 during the past five years, migratory bull trout been able to access -

26

and potentially breed - in the reach of Icicle Creek occupied by the resident bull trout population.  ARC 13053, 13094.

Even the periodic breeding of resident and migratory bull trout, which may already be occurring as a result of the O&M Plan, is likely to contribute to maintaining and improving the viability of the Icicle Creek population and its contribution to the viability of larger unit populations.  ARC 13094.  To stabilize or achieve a positive population growth trajectory in Icicle Creek, at least a few pairs of male and female migratory bull trout would probably need to successfully spawn in Icicle Creek annually. In part because the Hatchery has taken significant strides in this direction, FWS reached its "no jeopardy" finding. ARC 13101.

**4. Comprehensive Consideration of Possible Effects of O&M Plan**

Plaintiff states that FWS must consider the effects on listed species from all actions that are interrelated and/or interdependent with the agency action. 50 C.F.R. § 402.02.  Plaintiff argues that the 2008 BiOp is defective because it omits consideration of effects of some Hatchery operations—the on-site land application of wastewater solids—on ESA protected species.  Ct. Rec. 116 at 28.  FWS estimates that under the O&M Plan the addition of fish food at the Hatchery will produce, each year, approximately 30,000 pounds of total suspended solids and settleable solids, 3,830 pounds of ammonia, 760 pounds of total phosphorus, and other wastes not listed. 2008 BiOp, p. 80 (ARC 013090). Much of this waste settles in a pollution abatement pond at the Hatchery where it is then removed and spread out on dry land at the Hatchery. Id.

FWS has admitted that this activity, along with regular cleaning of

the abatement pond, will likely have significant impacts on listed species and therefore requires Section 7 consultation under the ESA. 2006 BiOp, p. 60, n. 4 (ARC 000235, n.4). Nonetheless, Plaintiff asserts that FWS fails to consider the impacts of these activities in the 2008 BiOp. Ct. Rec. 116 at 28.  Citing *Natural Res. Def. Council* v. *Kempthorne*, 506 F.Supp.2d 322, 383 n.38 (E.D.Cal. 2007) and *Natural Res. Def. Council v. Rodgers*, 381 F.Supp.2d 1212, 1234-37 (E.D.Cal. 2005), Plaintiff argues that FWS's intent to conduct ESA consultation on this activity in the future does not excuse it from considering it in the 2008 BiOp.  Ct. Rec. 116 at 28-29.  Failure to consider the effect of this activity, i.e., the abatement pond, is arbitrary, capricious, an abuse of discretion and not in accordance with law according to Plaintiff.

Defendants respond that bearing in mind the rational connection argument above, the 2008 BiOp evaluated effects of the O&M Plan against the survival and recovery needs for the bull trout Columbia River interim recovery unit identified. ARC 13094-13097. These were to maintain or expand bull trout distribution, maintain stable or increasing bull trout abundance trends, maintain and restore suitable habitat conditions, and conserve bull trout genetic diversity and provide opportunities for genetic exchange. Id.  FWS reasonably concluded the O&M Plan is not likely to change the distribution and abundance of bull trout.

The BiOp acknowledged that the O&M Plan will likely cause impaired passage from mid-May to early to mid-July. ARC 13095. These effects notwithstanding, and considering the fact that some migratory bull trout are likely to pass upstream, the 2008 BiOp concluded no appreciable reductions and some minor beneficial effects are likely to occur to the

resident populations of the Icicle Creek bull trout. ARC 13095. In sum, the 2008 BiOp concluded that the proposed action is not likely to jeopardize the continued existence of the coterminous U.S. population of the bull trout because the intended survival and recovery functions of the Columbia River interim recovery unit are likely to be maintained. ARC 13098.

With respect to the abatement pond argument made by Plaintiff, Defendants state that the 2008 BiOp took into account the entire range of effects flowing from operation of the Hatchery, including " ...(9) release if effluent into Icicle Creek resulting from the use of fish food." Ct. Rec. 129 at 18-19 (citing ARC 13077-13094). The 2008 BiOp also analyzed the effects of activities at the larger Wenatchee River Core Area level, as well as cumulative effects. The FWS assessed the effects of dams and agricultural practices, ARC 13042-13044, forest management, ARC 13033-13045, residential development, ARC 13045-13046, and fisheries management, ARC 13045-13046. Cumulative effects included the effects of future State, tribal, local or private actions that are reasonably certain to occur in the Hatchery area. ARC 13097. These included water diversions associated with the Hatchery and other diversions, ARC 13097, residential development, and recreation. ARC 13097-13098.

Additionally, Defendants point out that FWS has written 335 biological opinions from June 1998 until July 2006 on effects to bull trout. ARC 13039-13040. The FWS arrived at the same "no jeopardy" conclusion each time. Id. These opinions involved twenty-four different activity types, some of them much larger in scale than the O&M Plan,

1  ranging from road maintenance to timber sales, hydropower, and grazing.
2  Id. They were based on consideration of the range-wide and action area
3  conditions, and conservation needs of the bull trout, the effects of the
4  action, and any cumulative effects in the action area. Id. Given this
5  precedent, it is logical FWS made its no jeopardy finding here, where
6  only one fish would be killed, one harmed, and twenty-one whose breeding
7  behavior will be affected.  Defendants state that Plaintiff is incorrect
8  to suggest the FWS has failed to consider the possible effects of the O&M
9  Plan or that FWS "failed to draw a rational connection between the record
10 and the finding of no jeopardy." Ct. Rec. 116 at 20-22.

11
12    **5. ITS Validity**

13    Plaintiff states that the Incidental Take Statement ("ITS") issued
14 here is defective because it fails to account for all "take" anticipated
15 to result from the proposed action and lacks an adequate "trigger" for
16 reinitiation of consultation.  More specifically, Plaintiff asserts that
17 the ITS does not include anticipated take resulting from angling in the
18 spillway pool, nor does it set a trigger requiring the re-initiation of
19 consultation if more bull trout than anticipated are harmed through this
20 mechanism. This aspect of the ITS is therefore not in accordance with
21 law.  Additionally, Plaintiff argues, the ITS is also invalid because
22 there is no ascertainable "trigger" that requires the re-initiation of
23 consultation if more than 20 bull trout are harmed by blocking spawning
24 migration.  Ct. Rec. 116 at 29-30.

25
26

Defendants respond that the ITS is valid because FWS set a numerical measure of take and provided a reinitiation trigger. Ct. Rec. 129 at 31. The 2008 BiOp also includes a thorough ITS including five mandatory RPMs. ARC 13101-13107.  These RPMs are enforced by twenty-seven terms and conditions to minimize the Hatchery's effects. ARC 13101-13107.  The measures are non-discretionary, and must be undertaken by the Hatchery for the exemption from the ESA incidental take provision to apply. In addition to these RPMs, FWS has provided the Hatchery with twenty-eight conservation measures to further minimize or avoid adverse effects on bull trout. ARC 13110. The Hatchery is required to monitor and report on the O&M Plan's impact on the bull trout. 50 C.F.R. § 402.14(i)(3).

As for take, Defendants argue that the ITS clearly quantified the anticipated amount and extent of take.  Ct. Rec. 129 at 32.  The ITS stated the O&M Plan is likely to cause take of the bull trout in the form of capture and harm as a result of:

> 1. Bull trout being harmed (1 lethally and 1 sub lethally per year) via entrainment in the water intake system;
> 2. Injuring up to 20 migratory bull trout per year by significantly disrupting their breeding behavior by impairing their access to 23.5 miles of historically accessible habitat above the LNFH during the period from May 15 to July 7 (or somewhat later). This includes a temporary delay (days or weeks) for 5 individuals, and a longer delay (one year) or prevention for the other 15.

ARC 13102.  Defendants conclude that FWS provided a clear threshold against which the Hatchery's performance can be measured by FWS and the public.

**6. NEPA and the O&M Plan**

Plaintiff alleges the Hatchery has violated NEPA by failing to perform any NEPA analysis before adopting the O&M Plan. The Hatchery is a "Federal agency" as that term is used in NEPA, and the adoption of the O&M Plan is a "major federal action." Therefore, Plaintiff asserts, the Hatchery was required to prepare an EA either accompanied by a finding of no significant impact ("FONSI") or followed by an EIS, as well as an alternatives analysis. Ct. Rec. 116 at 35. Plaintiff argues, citing *Andrus v. Sierra Club*, 442 U.S. 347, 363 n.21 (1979), that the O&M Plan is not the routine and continuing operations of the Hatchery, but rather is a revision to an ongoing program that requires NEPA compliance. Ct. Rec. 116 at 35-36. Plaintiff argues the 2008 BiOp describes how operations under the O&M Plan differ from past operations, including an entirely new program of trapping and hauling threatened bull trout. 2008 BiOp, pp. 10-14 (ARC 013020-24).

Defendants, to the contrary, maintain that the O&M Plan was not subject to NEPA because it is categorically excluded and did not alter the status quo. Ct. Rec. 129 at 35-36. Supporting this argument, Defendants site to Chapter 8 of the Department of the Interior Manual[5] which promulgated categorical exclusions specific to the FWS. Specifically, the Department Manual excludes the following from documentation in an EA or EIS:

A. General.

---

[5]These exclusions were initially promulgated at 62 Fed. Reg. 2375 (Jan. 16, 1997), and were subject to public comment. Ct. Rec. 129 at 36.

(1) Changes or amendments to an approved action when such changes have no or minor potential environmental impact. . . .

B. Resource Management. . . .

(2) The operation, maintenance, and management of existing facilities and routine recurring management activities and improvements, including renovations and replacements which result in no or only minor changes in the use, and have no or negligible environmental effects on-site or in the vicinity of the site. . . .

(9) Minor changes in existing master plans, comprehensive conservation plans, or operations, when no or minor effects are anticipated. Examples could include minor changes in the type and location of compatible public use activities and land management practices.

(10) The issuance of new or revised site, unit, or activity-specific management plans for public use, land use, or other management activities when only minor changes are planned. Examples could include an amended public use plan or fire management plan.

Defendants conclude that FWS's handling of bull trout and improvement of their ability to spawn upstream, including improvements to the Hatchery's water control structures, fall within the categorical exclusions enumerated as A(1), B(2), B(9), and B(10).[6] Defendants state the O&M Plan takes important steps to reduce the Hatchery's impacts on bull trout passage. Provided the stipulated safeguards are followed, no adverse effects are expected to occur from handling of bull trout. The O&M Plan, moreover, minimally alters the way Hatchery has operated for

---

[6]Defendants cite to *Wilderness Watch, et al., v. U.S. Fish and Wildlife Serv.*, No. CV-07-1185-PHX-MHM, 2008 WL 4183040, at *10 (D. Ariz., Sept. 8, 2008) (granting summary judgment based on categorical exclusion of nearly identical project). Ct. Rec. 129 at 37.

1    decades. The FWS, therefore, was not arbitrary and capricious in the use

2    and application of these categorical exclusions.

3    **C.  Defendants' Position**

4         Defendants argue that FWS's "no jeopardy" finding in the 2008 BiOp

5    should be upheld because it considered all of the relevant factors, and

6    stated a rational connection between the facts found and its "no

7    jeopardy" finding. *Gifford Pinchot Task Force v. U.S. Fish and Wildlife*

8    *Serv.*, 378 F.3d 1059, 1065 (9th Cir. 2004).

9         The 2008 BiOp took into account the entire range of effects flowing

10   from operation of the Hatchery. These included the effects from:

11       (1) barriers and fish passage past LNFH, both historically and
             for the 2006-2011 period;
12       (2) fish trapping at LNFH;
         (3) incidental harvest of bull trout;
13       (4) improved effects on historic channel habitat quality;
         (5)   alteration of in-stream flows;
14       (6)   groundwater pumping;
         (7)   screening near the Hatchery water intake;
15       (8)   incidental take from the Hatchery's holding pond during
               salmon surplus activities;
16       (9)   release of effluent into Icicle Creek resulting from
               the use of fish food;
17       (10)  effects on bull trout prey base by juvenile Coho salmon
               and other species;
18       (11)  the effects of interaction between salmon species on
               the bull trout through competition, disease, predation,
19             and other causes; and
         (12)  sedimentation removed from the head of the Hatchery
20             water intake canal.
     ARC 13077-13094.
21

22       Defendants assert that the relevant ESA §7 test is whether the

23   Hatchery's action "reasonably would be expected, directly or indirectly,

24   to reduce appreciably the likelihood of both the survival and recovery

25   of the bull trout in the wild. Defendants state Plaintiff's argument is

26   flawed in that a "no jeopardy finding" for the listed species is

1  arbitrary and capricious just because a particular population is in
2  decline.

3       Defendants argue that the arbitrary and capricious standard of
4  review of the APA governs review of this environmental decision-making
5  before the court.  FWS's interpretation of its own regulations is subject
6  to deference.    Here,  FWS's  particular  expertise  is  involved  and
7  Defendants urge this Court to be at its most deferential in reviewing
8  this agency's findings.  *Marsh v. Oregon Natural Res. Council*, 490 U.S.
9  360, 376-77 (1989).

10      Defendants argue that the 5-year term is reasonable in light of the
11 fact that the Hatchery explained in detail that it would be upgrading the
12 water system by 2010 and it appears they have approval for this to go
13 forward.  Defendants conclude that FWS has not violated the ESA and is
14 not required to prepare an EA or EIS-thus no violation of NEPA as the O&M
15 Plan is within routine and continuing operations of the Hatchery and does
16 not alter the status quo.

17      **D. Court's Findings**

18      At the heart of Plaintiff's claims is the suggestion that the
19 Hatchery is moving too slowly to improve the bull trout's spawning
20 opportunities.    Here,  in  contrast,  FWS  has  chosen  to  demarcate  a
21 particular time period for its analysis based on practical circumstances.
22 Indeed, as demonstrated above, FWS's biological opinion analyzed and
23 articulated the effects of the entire action.

24      In the present case, the Court is persuaded that the 2008 BiOp was
25 adequate and that the FWS appropriately defined and justified the 5-year
26 term of the proposed action (O&M Plan).  Moreover, the Court finds that

the O&M Plan is categorically excluded from NEPA under Chapter 8 of the Department of the Interior Manual and because the O&M Plan's effects will be minimal.  The O&M Plan will affect a total of twenty-two (22) fish—only one lethally—and involves neither "controversial environmental effects," nor "unresolved conflicts concerning alternative uses of available resources."[7]  Moreover, the Court finds that the O&M Plan amounts to a federal action that merely maintains the status quo. Therefore NEPA requirements are not triggered and no EA or EIS was required.

The record indicates that the Hatchery, which simultaneously produces endangered Chinook salmon juveniles and serves tribal fisheries, is moving ahead in conjunction with BOR to implement a new water intake system by 2010, which is likely to result in significant changes requiring re-initiation of consultation, and, perhaps a new BiOp in 2011. ARC 13024.  Finally, under the "arbitrary and capricious" standard, this court must consider only whether an agency's decision was based on a consideration of the relevant factors and whether there has been a clear

---

[7]NEPA requires agencies to "study, develop, and describe appropriate alternatives to recommend courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources." 42 U.S.C. § 4332(2)(E).  Opposition to a project does not necessarily create a controversy requiring an EIS under NEPA.  42 U.S.C.A. § 4321 et seq.

error of judgment.   Mindful of the limited scope of review, this court concludes that the 2008 BiOp, considered as a whole, is sufficiently well-documented and explained. "[S]atisfied that [the] agency's discretion is truly informed," this court defers to that informed discretion. *Greenpeace Action v. Franklin*, 14 F.3d 1324, 1332 (9th Cir.1992).   Under the applicable standard of review, the "no jeopardy" conclusion made by FWS was not arbitrary and capricious.

**E. Motions to Strike**

This decision does not rely on the documents the parties seek to strike in their respective motions.

/ / /

**VI.   CONCLUSION**

The parties have cross-moved for summary judgment on all claims. The Court grants summary judgment to the Defendants on all claims and denies summary judgment to Plaintiff on all claims.   Accordingly,

**IT IS ORDERED** that:

1.  Plaintiff's Motion For Summary Judgment, **Ct. Rec. 69**, is **DENIED**.

2**.**   Defendants' Motion for Summary Judgment, **Ct. Rec. 130**, is **GRANTED.**

3.   Plaintiff's Motion to Strike And Alternative Motion to File Sur-Reply, **Ct. Rec. 138**, is **DENIED AS MOOT.**   The "Conservancy Report' shall be stricken as it was filed by mistake and has already been removed from the record by Defendants.   Defendants' arguments regarding the abatement pond will not be stricken.   Plaintiff's request to file a Sur-Reply is **DENIED** as Plaintiff fails to identify any argument in Defendants' Reply not previously raised.

1    4.   Defendants' Motion to Strike, **Ct. Rec. 143**, is **GRANTED**.
2  Plaintiff's do not oppose this motion and the Declaration of Nick Gayeski
3  is stricken.

4    The District Court Executive is directed to file this Order and
5  provide copies to counsel, close file and enter judgment accordingly.

6    **DATED** this 30th day of April, 2009.

7

8                                   *s/Lonny R. Suko*
                                _____
9                                    LONNY R. SUKO
                               UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26